## HAMP v. STATE.

### (No. 649.)

WATER AND WATER RIGHTS—PUBLIC SUPERVISION—CONSTITUTIONAL-
ITY — POLICE POWER — WATER COMMISSIONERS — REGULATION OF
HEADGATES—AUTHORITY—INTERFERENCE WITH HEADGATES—CRIM-
INAL LAW—EVIDENCE—IRRIGATING DITCHES—OWNERSHIP—BOARD
OF CONTROL—AUTHORITY.

1. The State may supervise and control the appropriation, di-
   version, and distribution of the public waters, and impose
   that duty by statute upon administrative officers.

2. The fact that a water official, when engaged in the discharge
   of his duties pursuant to statutory provisions, makes or
   may make an erroneous or wrongful distribution of water
   in individual cases, or erroneously opens a headgate to the
   passage of water for the use of an appropriator whose
   right to so use the headgate or ditch is denied by another,
   is no reason for holding the statute prescribing the duties
   of the officers to be unconstitutional. .

3. By the supervision on the part of public officials of the di-
   version of water according to priority of appropriation no
   rights of private property are invaded, but, under the police
   power of the state, in the interest of the public welfare, and
   for the protection of private as well as public rights, prop-
   erty intended to be used for no other purpose than that of
   diverting public waters is regulated. Such regulation does
   not constitute the taking of private property for either pri-
   vate or public use, within the meaning of the constitutional
   provision prohibiting such taking without just compen-
   sation.

4. All property is held subject to such restraints and regulations
   as the state may constitutionally make in the exercise of its
   police power.

5. The statute providing for the regulation by public officials of
   the diversion and distribution of public waters according to
   adjudicated priorities is not objectionable upon constitu-
   tional grounds for the reason that it does not provide for
   a hearing with notice to all appropriators or ditch owners to
   determine the necessity of a proposed regulation.

6. The statue provides that whenever a water commissioner, in
   pursuance of his duties, regulates a headgate, he shall at-
   tach thereto a written notice, properly dated and signed, to
   the effect that such headgate has been properly regulated
   and is wholly under the control of such commissioner. *Held*,

that the statute is not objectionable on the ground that the owner is not given an opportunity to be heard before the headgate is regulated.

7. In a prosecution for wilfully interfering with the headgate of a ditch without authority, where the proper water commissioner had taken control of and regulated the headgate, the question of ownership of the ditch or headgate was immaterial, and an instruction was proper to the effect that it was not within the province of the jury to consider the matter of ownership.

8. If one claiming to be the owner of a headgate which has been regulated by a water commissioner has any proper ground to complain of the manner or the purpose for which it was regulated, he may apply for relief in the courts through some appropriate proceeding, but he is not justified in attempting to enforce what he may regard as his legal rights by interfering with the headgate as regulated, in violation of a penal statute.

9. A violation of law, even when committed for the purpose of enforcing the law, is illegal.

10. Although the determination by the board of control of the priorities of appropriation from a certain stream is not to be conclusive upon the question of the ownership of the ditch through which an appropriation is claimed or found to have been effected, or the right of the appropriator to use the same, the board must necessarily consider and determine, as incident to its power to adjudicate priorities, and as a partial basis for its decision upon the question of water rights and priorities, whether or not one claiming an appropriation is the owner of or has a sufficient interest in a ditch or other irrigating or diverting works by which the water so claimed may be diverted and conveyed to the place of its application to a beneficial use; the matter of the ownership or interest in the ditch or other works is evidentiary in the adjudication proceeding before the board, and considered for the purpose stated, but the finding of the board upon that matter does not conclude a subsequent determination by the court in a proper case of the relative rights of the parties claiming the ditch or an interest therein, although the board's decree may be final and conclusive, in the absence of an appeal, as to the water rights and priorities.

11. Where the board of control has adjudicated the several priorities of water appropriations from a certain stream, and issued certificates of appropriation based upon its decree,

and the proper water commissioner has regulated a head-gate in accordance with the priorities so adjudicated, one claiming to own a headgate and connecting ditch as against the person holding the certificate of appropriation, is not justified in interfering with the headgate so regulated on the ground that the board had no jurisdiction to determine the question of the ownership of the ditch and headgate.

12. A water commissioner is authorized to act upon the certificates of appropriation, and distribute the water accordingly.

[Decided November 6, 1911.]                    (118 Pac. 653.)

ERROR to the District Court, Uinta County; HON. DAVID H. CRAIG, Judge.

The material facts are stated in the opinion.

*J. H. Ryckman, S. T. Corn,* and *Ivan S. Jones,* for plaintiff in error.

The control of a ditch or headgate by the water commissioner is a deprivation of or damage to private property within the inhibition of the constitution. Any authority or duty imposed upon a ministerial or executive officer to assume possession and control of property or the property rights of individuals, without their consent, can only be conferred by statute expressly conferring the authority or imposing the duty. The control given by statutes to water commissioners necessarily includes the physical control of the land occupied by the ditch and headgate. In the case at bar the act of the water commissioner added a burden to the land of Hamp by flowing water through his ditch for the use of Roberson. (Coal Co. v. Cozad, 79 O. St. 348, 20 L. R. A. (N. S.) 1092.) It was contended by Hamp when he closed the headgate after it had been raised by the water commissioner, that the latter could not legally flow water through his ditch for the benefit of Roberson. The imposition of that easement on the land of Hamp for the use of Roberson was as much a taking of the land as though the officer had attempted to convey it to Roberson. (Yick Wo v. Hopkins, (U. S.) 30 L. Ed. 220; Janesville

v. Carpenter, 77 Wis. 288, 20 Am. St. 123; People v. Hawkins, (N. Y.) 68 Am. St. 736; State v. Julow, (Mo.) 50 Am. St. 443; Block v. Schwartz, 27 Utah, 387, 76 Pac. 22.) One of the most essential attributes of the ownership of property is the right to exclude all other persons therefrom and to use it without interference. (People v. Otis, 90 N. Y. 48; Re Jacobs, 50 Am. Dec. 636.) The act of a water commissioner in taking control of a headgate for the purpose of flowing water through it, or the ditch connected with it, is an invasion of private property, and violates the constitution. (Pumpelly v. Green Bay &c., 13 Wall. 166; Hooker v. New Haven &c., 14 Conn. 146; Rowe v. Bridge Co., 21 Pick. 344; Canal Aprs. v. People, 17 Wend. 604; Stevens v. Middlesex Canal, 12 Mass. 466.)

The board of control has no judicial power to determine the ownership of an irrigating ditch. (Farm Inv. Co. v. Carpenter, 9 Wyo. 110.) The legislature is without power to change the control of property from one party to another. (State v. Neff, 52 O. St. 375, 28 L. R. A. 409; Norman v. Heist, 5 W. & S. 171.) The statutes authorizing the regulation by water commissioners do not provide for due process of law, for no opportunity is given to the ditch or headgate owner to be heard. (Phila. v. Miller, 49 Pa. 448; Sterritt v. Young, 82 Pac. 946; State v. Hotel Co., 9 Mo. App. 455; Land Co. v. Buffalo, 7 Neb. 258; Kuntz v. Sumption, 117 Ind. 1, 60 N. E. 474; Pennoyer v. Neff, 95 U. S. 714; Stuart v. Palmer, 74 N. Y. 188.) The statute which provides for a notice to be affixed to the headgate setting forth that the same has been properly regulated and is wholly under the control of the commissioner, provides for a notice of an official act already done, and is therefore insufficient because the owner has not been heard. (8 Cyc. 1082, and cases cited; Pennoyer v. Neff, *supra;* Canon City v. Manning, 95 Pac. 537; Brown v. Denver, 7 Colo. 311; Jenks v. Stump, 93 Pac. 17.) What the law does not permit to be done directly may not be done indirectly.

*A. Crawford* and *B. M. Ausherman,* for defendant in error.

The matter of ownership, so far as the appellant is concerned, is only an inference under the evidence and is not to be determined by this court. Adverse possession of the right of way by Roberson has resulted in title. (Bashore v. Mooney, 87 Pac. 553.) It was not established that the appellant had acquired in any way a water right or a right of way in the ditch. D. O. Roberson is the only party shown to have any such right, since he is the only one shown to have had a certificate of appropriation. The points made by counsel for plaintiff in error and the authorities cited are foreign to anything in this case. The right of Roberson to have the water flow through the headgate attaches to his interest in the ditch. (Willey v. Decker, 11 Wyo. 544.) The headgate is an appurtenance to the ditch, and its use is subject to the statutes providing for the regulation of headgates.

POTTER, JUSTICE.

Clark G. Hamp was tried and convicted before a justice of the peace of the statutory offense of willfully interfering with the headgate of an irrigating ditch without authority. He appealed to the district court, where he was again convicted and was fined in the sum of twenty-five dollars and ordered to pay the costs taxed in the case. The complaint or information charges that on the 26th day of May, 1908, in the county of Uinta, the said Hamp did "willfully and without authority, close, change and interfere with the headgate of the ditch known as the Desert Ditch No. 2 and the Hamp Extension Ditch (describing its location), which said headgate and ditch was then and there under the control and regulation of John W. Blackwood, an assistant water commissioner, contrary to the form, force and effect of the statute in such case made and provided, and against the peace and dignity of the State of Wyoming."

The statute declares that any person who shall willfully open, close or interfere with any headgate without authority shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not exceeding one hundred dollars or imprisonment in the county jail for a term not exceeding six months, or both such fine and imprisonment. (Laws 1890-91, Ch. 8, Sec. 42; Rev. Stat. 1899, Sec. 97; Laws 1901, Ch. 86; Comp. Stat. 1910, Sec. 817.)

The material facts are as follows: Daniel O. Roberson, the complaining witness, had been granted by an order of the board of control a certificate of appropriation of water from Fontenelle Creek through the ditch in question for the irrigation of land lying under the ditch; the certificate stating that such appropriation had been duly determined and established by said board of control on the 12th day of June, 1907. John W. Blackwood was appointed an assistant water commissioner in the manner provided by statute for the water district in which said ditch is situated, "for the purpose of aiding the water commissioner of said district, and particularly in the distribution of water from that ditch taken out from Fontenelle Creek in said district and known as Desert Ditch No. 2." By direction of the superintendent of the water division embracing such district, said assistant water commissioner took charge of the headgate described in the information, and raised and locked it so as to allow the passage of water into the ditch for the use of Roberson in accordance with his certificate of appropriation, and, at the same time, attached to the headgate a notice dated and signed by him in his official capacity, stating that the headgate had been properly regulated by him and was under his control, and that any person interfering with the same would be prosecuted to the full extent of the law. While the headgate was in that condition, and the commissioner remained in control, the defendant broke the lock and closed the headgate. There was testimony to the effect that he also tore off the

official notice. He denied that or that he read the notice, but admitted that he saw it. We think the evidence clearly shows that, irrespective of the notice, the defendant assumed, if he did not know, that the headgate had been officially regulated by one claiming to have been appointed as assistant commissioner, and claiming authority to divide and distribute the water of the stream referred to and to regulate the headgate of this ditch, and that the acts of defendant were committed in willful defiance of such authority, claiming that Roberson had no right to use the ditch. Upon the trial the defendant attempted to justify his acts upon the ground that he had built and was the owner of both headgate and ditch, and that Roberson had no interest in or right to use the same.

The trial court ruled that the question of ownership of the ditch or headgate was immaterial in this case, stating, during the taking of the testimony: "Whether Roberson had any interest in this ditch would not make any difference. This is interference with an officer of the law." However, a limited amount of evidence was received relating to the construction and use of the ditch and headgate, and the ownership of the land crossed by the upper end of the ditch above the Roberson land, and upon which the headgate is located; the defendant claiming that a third party owned such land, and that he, the defendant, was the sole owner of the right of way for that part of the ditch. But such evidence is obviously lacking in a showing of all the facts necessary to a satisfactory conclusion, if the matter was to be conclusively determined, and which it may be supposed, would have been shown had the court held such facts to be material. Enough appears, however, to show that both parties had used the ditch, and that there was a dispute between them as to its ownership and Roberson's right to conduct his appropriated water through the same, or at least through that part of the ditch above his land. The fact was brought out in the evidence that at the hearing before the board of control resulting in the granting of

Roberson's certificate of appropriation, the defendant had appeared and contested such right on the ground that Roberson had no interest in the ditch in question through which he claimed to have made his appropriation.

The history of the ditch presents some peculiar features. It appears to have originally been built by a former owner of the Roberson land, at that time taking water from a slough which derived its supply from the main creek; the Roberson land lying under the ditch as originally so constructed. Subsequently Hamp, whose land was below the land of Roberson, extended the ditch to his land and also extended the upper end of the ditch to the main creek where the headgate in question was put in. Mr. Holden, who was at one time superintendent of that water division, testified as follows: "Mr. Roberson made an application—it was executed before me, asking for a permit to use water through Desert Ditch No. 2. It was the original application. Subsequently Mr. Hamp made an application to enlarge that ditch. There was a ditch right that irrigated part of the land owned by Mr. and Mrs. Roberson at the time Mr. Hamp asked for permission to enlarge this ditch, and the water had been used through this ditch for that purpose. But at this time, when the ditch was first made, it did not extend to the creek but took water out of the slough. That derived its source of supply from the main creek, and there wasn't a great deal of land irrigated up there, probably not over 40 acres; but when Mr. Hamp asked permission to enlarge this ditch, then it became necessary to cut through to the creek, owing to the change in the channel of the creek, and there wasn't as much water in the slough as prior to that time. In order to furnish water for all those people it became necessary to cut through to the creek * * * the creek coming from the north, the dam had been thrown across the slough and this ditch already taken from that slough, and in enlarging they cut through from the slough to the main creek, in order to supply water for them all, they put in a dam there.". Mr. Holden also

testified that he was not present when the arrangements were made between Roberson and Hamp for enlarging the ditch, but that he talked with both Roberson and Hamp about it, and in answer to the question, "What was the arrangement?" he testified: "That it would be necessary for Hamp in order to enlarge the ditch so as to furnish water for them all to cut through to the main creek." On cross-examination the witness was asked if the application of Roberson was not for a waste water right, and he answered: "No, no, the source of supply was Fontenelle Creek." And he also stated that prior to the Roberson application the ditch extended from the slough down to the Roberson land. Mr. Dunton, the water division superintendent at the time the present controversy occurred, testified that what is called Hamp's extension ditch is merely an extension of the same ditch, that there is but one ditch there, and that after it passes Roberson's place it goes on down to Hamp's place.

The court instructed the jury that it was not within their province to consider the question of the ownership of the ditch or headgate, or the defendant's interest therein, if they found that the assistant water commissioner was in control thereof; and that the fact that the defendant may have been a user of water from the ditch, and a co-owner therein, did not, at the time the ditch was under the control and supervision of the assistant water commissioner, give the defendant any greater right or privilege to interfere with the distribution of water, and with the opening and closing of the headgate, than if he had been a disinterested party. The jury were also instructed in effect that the notice required by statute to be attached to the headgate by the water commissioner upon assuming control of the same is a notice to all parties interested in the distribution of water through the ditch. An instruction requested by the defendant to the effect that the jury should find the defendant not guilty, if they found that he was the owner of the ditch and headgate, or that the complaining witness

had no legal estate in the land covered thereby, was refused; and also an instruction directing a verdict of not guilty.

It is here contended as grounds for reversal: (1) That the verdict is not sustained by sufficient evidence, for the reason that Hamp is shown by the evidence to be the owner of the ditch and headgate. (2) That the statutory provisions for the control and regulation of headgates are unconstitutional and void, for the reason that they deprive a person of his property without due process of law, and authorize the taking and damaging of private property for private use without just compensation. Since the evidence as to ownership of ditch and headgate was practically withdrawn from the consideration of the jury, the point to be considered in that connection seems to be whether the instructions correctly stated the law of the case, rather than the sufficiency of the evidence to support the verdict. It is argued that the control of the water commissioner necessarily includes the physical control of the land occupied by the ditch and headgate, and that in the case at bar the commissioner added a burden to Hamp's land by flowing water through his ditch for the use of Roberson; that while the defendant does not deny Roberson's right to use the water of the state for the irrigation of his land, he does deny Roberson's right and also the authority of the commissioner to impose an easement on the defendant's land for Roberson's benefit; that the imposition of such an easement was as much a taking of the defendant's land as though the officer had assumed to convey it by deed to Roberson; and that the act of a water commissioner in taking control of a headgate for the purpose of flowing water through it or the ditch is an invasion of private property.

In several former decisions of this court the constitutional and statutory provisions relating to the control and distribution of appropriated waters have been set out and, with reference to the questions then before the court, some of such provisions have been explained and construed. - (See

Farm Investment Co. v. Carpenter, 9 Wyo. 110; Ryan v. Tutty, 13 Wyo. 122; Whalon v. Canal Co., 11 Wyo. 313.) A re-statement of such provisions so far as pertinent will, however, we think, aid in the discussion of the questions here presented.

The constitution of the state declares the water of all natural streams, springs, lakes or other collections of still water, within the boundaries of the state, to be the property of the state; that priority of appropriation for beneficial uses shall give the better right; that the control of such water must be in the state, which, in providing for its use, shall equally guard all the various interests involved. It provides for a board of control, composed of the state engineer and superintendents of water divisions, "which shall, under such regulations as may be prescribed by law, have the supervision of the waters of the state, and of their appropriation, distribution and diversion, and of the various officers connected therewith;" and creates the office of state engineer, makes the incumbent thereof the president of the board of control, and confers upon him the power of general supervision of the waters of the state, and the officers connected with its distribution. (Art. VIII; Art I, Sec. 31.)

The board of control is required by statute to determine the priorities of right to the use of the public waters of the state, from which determination a party may appeal to the courts; and following such determination, a certificate of appropriation is required to be issued to each party represented in such determination, setting forth the name and postoffice address of the appropriator, the priority date and number of such appropriation from the stream involved in the determination; the amount of water appropriated; and a description of the legal sub-divisions of the land to which the water is to be applied, if the appropriation be for irrigation. Such certificate is required to be sent to the proper county clerk for recording in a book specially provided for that purpose. (Comp. Stat. 1910, Secs. 761-768.)

At the first session of the legislature following the admission of the state a statute was enacted providing for the supervision and use of the waters of the state, which embraced the above mentioned provisions, and whereby, for the first time in the history of the legislation on the subject in this state, it was required that one intending to appropriate any of the public waters, shall, before commencing the construction, enlargement or extension of any distributing works, or performing any work in connection with such appropriation, make an application to the president of the board of control for a permit to make such appropriation, setting forth in the application, among other things, the location and character of the proposed works, or, as the statute was afterwards amended to read, "the location and description of the proposed ditch, canal or other work;" and that if the permit be granted, then, upon its subsequently appearing to the satisfaction of the board of control, that the appropriation, pursuant to such application, and the endorsement thereon by the state engineer has been completed, a certificate of appropriation shall be issued and sent to the county clerk to be recorded. (Laws 1890-91, Ch. 8. Sec. 34; Comp. Stat. 1910, Secs. 727-738.) By the same act the state was divided into four water divisions as required by the constitution, the appointment of superintendents thereof provided for, and their duties specifically prescribed; and thereby also the office of water commissioner was created, or rather retained, for that office had existed under territorial laws.

The provisions of the statute enacted in 1890 have been amended from time to time, but in no respect material to the questions here involved. The division superintendents are given general control over the water commissioners, and, under the general supervision of the state engineer, are required to execute the laws relative to the distribution of water in accordance with the rights of priority of appropriation. The board of control is required to divide the state into water districts, "such districts to be so constituted

as to secure the best protection to the claimants for water, and the most economical supervision on the part of the state," the statute providing that such districts shall not be created "until a necessity therefor shall arise, but shall be created from time to time as the appropriations and priorities thereof from the streams of the state shall be adjudicated." (Comp. Stat. 1910, Sec. 799.) One water commissioner is required to be appointed by the governor for each water district, who is to be selected from persons recommended by the division superintendent. (Id. Sec. 800.) It is made the duty of such commissioner to divide the water of the natural stream or streams of his district among the several ditches and reservoirs taking water therefrom, according to the prior right of each, respectively, in whole or in part, and to shut and fasten or cause to be shut and fastened, the headgates of ditches, and to regulate or cause to be regulated the controlling works of reservoirs, in times of scarcity of water, as may be necessary by reason of the priorities of right existing from the streams of his district. He is also given authority to regulate the distribution of water among the various users under any partnership ditch or reservoir where rights have been adjudicated, in accordance with existing decrees. (Id. Sec. 801.) And he is required, as near as may be, to divide, regulate and control the use of the water of all streams within his district by such closing or partial closing of the headgates as will prevent the waste of water, or its use in excess of the volume to which the appropriator is lawfully entitled. Any person injured by any act of the commissioner, or his failure to act, is granted the right of appeal to the superintendent. One aggrieved by the latter's decision may appeal to the state engineer, and from the decision of the engineer an appeal is allowed to the district court of the county wherein the ditch or ditches over which the controversy arises are situated. (Id. Sec. 802.) In cases of emergency, the water commissioner may employ suitable assistants to aid him in the discharge of his duties, such assistants being

required to take the same oath as the water commissioner, and to obey his instructions. (Sec. 804.) And the commissioners and their assistants, within their districts, are expressly granted the power of arrest in cases of the violation of the statute upon which this prosecution was based. (Sec. 818.) Clerks of the several district courts are required to forward forthwith to the board of control a certified copy of any judgment involving or affecting the title to any water right. (Sec. 797.) And thus the attempt is made to provide in the office of the board of control a record, as complete as possible, of adjudications affecting water rights. The division superintendent is authorized to call upon the water commissioner for work in his district whenever the necessity therefor may in his judgment arise. (Sec. 805.) The final orders or decrees of the board of control, in adjudication proceedings provided for by law as to water rights, are made conclusive upon all prior appropriators as to all existing claimants upon the stream or other body of water lawfully embraced in the adjudication, subject to the provisions of law for rehearings, reopening of orders or decrees therein, and for appeals therefrom. (Sec. 793.)

Whenever a water commissioner, in the pursuance of his duties, regulates a headgate he is required to attach thereto a written notice properly dated and signed, setting forth the fact that such headgate has been properly regulated and is wholly under his control; and the statute declares that such notice shall be a legal notice to all parties interested in the division and distribution of the water of such ditch or reservoir. The county and prosecuting attorney is required to appear and defend the division superintendent or any water commissioner who shall be made a defendant in any case arising in the pursuance of the official duties of any such officer. (Id. Sec. 801.) A substantial headgate at the point where the water is diverted, is required to be maintained by the owner or owners of any ditch or canal, to the satisfaction of the division superintendent, so

that it can be locked and kept closed by the water commissioner; and it is further provided that ditch owners shall construct and maintain, when required by the division superintendent, flumes or other measuring devices at such points along the ditch as may be necessary to assist the water commissioner in determining the amount of water that is to be diverted into the ditch from the stream, or taken from it by the various users. Upon the refusal of the owner to comply with any such requirements, the water commissioner is required, upon the order of the superintendent, to close the ditch to the passage of water, and until the headgate, flume or flumes or measuring devices are constructed, it is provided that the ditch so closed shall not be opened or any water diverted from the source of supply under the penalties prescribed by law for the opening of headgates lawfully closed. (*Id.* Sec. 740.) An application for a permit to appropriate water must be accompanied by a map showing the location and extent of the proposed work, and if a ditch is proposed to be constructed its location must be defined on the map, and also the location of the headgate or point of diversion; and the state engineer may require a more detailed showing as to the plan of the diverting works. (*Id.* Secs. 733-737.)

We have had no difficulty in reaching a conclusion in this case; but the importance of the questions presented seems to justify the above reference to the several statutory provisions appearing to be more or less pertinent, and also to furnish a sufficient reason for the discussion that is to follow, which might otherwise be regarded as unnecessarily extended. This court has already spoken upon what is conceived to be the fundamental proposition involved in the case, *viz:* the necessity and validity of the constitutional and statutory provisions for an effective public control of the waters of the state, and the previous general expressions of the court have, we think, a decisive bearing upon the questions now before us. That the state may supervise and control the appropriation, diversion and distribution of the

public waters, and impose that duty upon administrative offi-
cers, is settled by our former decisions, and is equally well
settled in other states, where the doctrine of prior appro-
priation of water prevails. Indeed, it is suggested by Pro-
fessor Freund in his work on the Police Power that the
common law principle affecting the rights and duties of
riparian proprietors, instead of being left so largely to
judicial application and enforcement, might well be made
the subject of statutory and administrative regulation. (Sec.
425.)

Statutes similar to our own have been adopted in most
of the western states. (See Wiel on Water Rights, 3rd
Ed., Secs. 124, 1184-1189.) In Section 1184 of the work
cited it is said: "Wyoming has developed a system of
state water supervision and administration which was
adopted in other states, and now forms the basis of the
water code system in this respect." And in Section 124,
the learned author, after referring to the absence of recent
legislation in certain states affecting the law of waters, says:
"But in most of the other states, extensive codes have been
adopted, within the last few years, based solely on the law
of appropriation, and chiefly for the encouragement of
irrigation, though applying to all pursuits, under the in-
fluence in some degree of the United States reclamation
service. This legislation is still going on. The features
of this legislation originated partly in Colorado, but chiefly
in Wyoming. * * * The new statutes are chiefly administra-
tive, providing for the enforcement of the rights defined by
case law, and for a policing of the waters. They are an
application of the theory of public ownership of natural
resources. * * * The essentials of all these statutes con-
sist in an enactment of the law of appropriation as the
sole law on the subject of waters, with a declaration of
state or public ownership of all waters; a reorganization
of the state for administrative purposes as concerns waters;
a census, a determination and listing of all existing appro-
priations; a comprehensive method of making appropria-

tions hereafter; and various provisions for policing the waters. The object of the legislation is in the nature of police regulation under the police power to secure the orderly distribution of water for irrigation."

The constitutionality of the statutory provisions generally relating to the duties of water commissioners, insofar as they require or authorize a control and regulation of the diversion and distribution of appropriated waters in accordance with adjudicated priorities, is in effect, we think, sustained by the reasoning and conclusion in the case of Farm Investment Company v. Carpenter, 9 Wyo. 110, upon the principal point involved in that case. It was there held that the declaration of our constitution that all waters subject to appropriation for beneficial purposes are the property of the state was valid and effectual, and the power of the state, through the administrative agency of the board of control and subordinate officers, to supervise and control the appropriation, diversion and distribution of the waters of the state, (equally guarding, of course, the various interests involved) was upheld. The main question in the case was whether the statute providing for the adjudication of water rights and priorities by the board of control was valid, the constitutionality thereof being challenged on the ground that it conferred judicial power upon the board in violation of the constitution. It was held that though under the power vested in the board to determine the rights to the use of the waters of the state, it exercises quasi-judicial authority, such determination by the board is primarily administrative rather than judicial, and that the power of adjudication was properly conferred upon the board as necessary to its supervisory powers conferred by the constitution. It was said in the opinion: "It has already been suggested that the supervision of the board affects individual appropriations, and concerns the distribution of water to individual claimants. Any effort to supervise and control the waters of the state, their appropriation and distribution, in the absence of an effective ascertainment of the several priorities of rights, must result in practical failure, in times

when official intervention is most required." And again:
"The supervision of the board affects the water of natural
streams, the title to which while flowing in its accustomed
channels remains in the state or public, and of such a
peculiar character that public control is demanded to insure
its orderly, economical, and fair distribution."

And, again, in Ryan v. Tutty, 13 Wyo. 122, 78 Pac. 661,
this court said that the various statutory provisions for the
distribution of water among different appropriators accord-
ing to their respective priorities by public officials "were
doubtless adopted in pursuit of a wise and salutary policy
to afford an economical and speedy remedy to those whose
rights may have been wrongfully disregarded by others, as
well as to prevent waste, and to avoid as much as possible
unseemly controversies that are liable to occur, in the ab-
sence of suitable supervision, where several persons are
entitled to share in a limited public commodity or privilege."
That was remarked with special reference to the provisions
prescribing the duties of division superintendents and water
commissioners. That case involved a controversy between
appropriators as to the water of certain springs claimed by
the plaintiff to be tributary to a certain stream from which
his appropriation had been made; and it was contended
by the plaintiff that as the water commissioner and division
superintendent had each investigated the matter and had
decided in favor of the plaintiff's rights to the water of
the springs, and ordered the defendant to allow the same
to flow into the main stream for plaintiff's use, the defend-
ant was concluded thereby, in the absence of an appeal
from such decision. That contention was not sustained,
but the court held that although it was incumbent on the
commissioner before acting to satisfy himself on the ques-
tion, his decision, or a failure to appeal therefrom, did not
cut off the right of the interested parties to contest the
matter in some proper proceeding in the courts; nor divest
the courts of their general jurisdiction in the premises. But
some of the statements contained in the opinion relative to
the authority of the water commissioner and division su-

perintendent are pertinent here. It was said that the statute clearly contemplates that the action of such officers is to be based upon a record of adjudicated priorities. It had been remarked in Farm Investment Co. v. Carpenter, *supra,* that water districts are required to be established as priorities of appropriation are adjudicated, and the same remark occurs in the case now referred to. Recurring to the opinion in Ryan v. Tutty, we said concerning the officers above mentioned: "They are not vested with arbitrary control, but are required to divide the water according to the prior rights of the interested parties. The duties imposed upon them in the matter now under consideration are executive; they are administrative agents; and, while in the performance of their duties the exercise of judicial discretion is necessary to a very limited degree, the power conferred is executive rather than judicial, and although an appeal is allowed from their action and decision to higher authority, and even in the end to the courts, we find no design in the statute to render the remedy by appeal exclusive. * * * Primarily, the commissioner is authorized, whenever legally called upon, and it is his duty, to see that the water of a particular stream is diverted in accordance with the established priorities, and to prevent anyone from taking more water than he is entitled to take to the injury of others. He is not authorized to determine priorities. But in regulating the distribution of the water it may become incidentally necessary for him to ascertain for that purpose alone whether, and to what extent, a prior appropriator is injured by a diversion above him on the same stream or a tributary. The only object of his inquiry is that he may justly and fairly make a temporary distribution of the water in conformity with the adjudicated priorities. We perceive nothing in the statute, or in the nature of his duties, that renders a decision on his part in the premises a permanent adjudication of the matter, or that even prevents him from changing his decision when again called upon to perform similar duties should he conclude that he had previously acted erroneously." And we said

further in the same connection: "It is true that it is the
duty of appropriators and others to respect his authority
and orders, and that, for a violation thereof, an offender
may be punished, under the statute, as for a misdemeanor.
But that is no reason for holding his action and decision
binding upon the courts when the point in controversy
comes before them for determination in an appropriate
action between the interested parties."

The statutes of Oregon seem to contain the latest enact-
ment of a water code based upon the system adopted in
this state. (See Wiel on Water Rights, Sec. 1443.) The
local supervising officer is there named water-master, and
is required to perform the same duties that are imposed by
our laws upon the water commissioner. In a recent case
the supreme court of that state had under consideration
the construction of the statutes with reference to the time
when a water-master had authority, by regulating the dis-
tribution of the water, to enforce the rights of priority
as established, the particular question being whether he
had such authority as to rights previously established by
judicial decree, but which had not been acted on by the
board of control. The validity of the statutes do not
appear to have been questioned, but were evidently assumed,
for the court said: "The intent of the act seems to be to
place the control of irrigating water under the jurisdiction
of the board of control as rapidly as rights are determined
by it, and become a matter of record in its office. When
the board convenes to determine such rights, prior decrees,
made independent of action by the board, are conclusive
upon it as between the parties to such decrees, and there-
after the rights established thereby may be enforced by the
water-master, the same as though they had been originally
determined by the board. · But, in the absence of such
determination in accordance with the water code, such
rights must be enforced by the court making the decree."
(Wattles v. Baker County, 117 Pac. 417.)

The system of public control of appropriated waters in
Colorado is practically the same as in this state, except

that instead of an adjudication of the various priorities of rights by a board of control in the first instance, as in this state, a statutory proceeding in the district court for that purpose is provided for. The division superintendents, there designated as superintendents of irrigation, and water commissioners, are appointed by the governor, and the statutes prescribing their duties are very similar to our own. It is well and definitely settled in that state that such statutory provisions are not unconstitutional. (Farmers' Independent Ditch Co. v. Agricultural Ditch Co., 22 Colo. 513, 45 Pac. 444; Roberson v. People, 40 Colo. 119, 90 Pac. 79; McLean v. Farmers' Highline Canal & Reservoir Co., 98 Pac. 16.) In Farmers' Ind. Ditch Co. v. Agr. Ditch Co., the court say: "The statute clothes the superintendent with no judicial power. It provides that he shall ascertain the priorities as established by decrees of the district court, and register the same in a book to be kept for that purpose; and that he shall, to the best of his ability, take care that each and every ditch shall receive the water to which it may be entitled under such judicial decrees. The power conferred is executive, and not judicial." Referring to the difficulties that had arisen in the absence of proper regulative legislation, the court further say: "The legislature, by the act of 1887, has attempted to solve the difficulty by providing an officer, and making it his duty to distribute the water according to the decrees rendered, without reference to the district in which such decrees are to be found. As we have said, the act does not attempt to make such decrees conclusive as between the various districts, but, in effect, it provides that until the courts shall determine otherwise in some appropriate proceeding, the superintendent shall treat the decrees as *prima facie* correct, and distribute the water accordingly. We believe this regulation is fairly within the police power of the state." It may be said in passing that the difficulty caused by decrees in different districts is obviated by the provisions of our constitution and statutes vesting general control and power of adjudication as to all priorities in the board of control,

with the right, however, of appeal to the courts; but when the matter is determined on any such appeal, the order is transmitted to the board, and by the secretary entered upon its records.

In McLean v. Farmers' Highline &c. Co., *supra,* the court say: "With priorities settled, it became necessary to appoint officials whose duty it is to distribute the waters of a stream according to the decreed priorities therein. Their functions and authority cannot be interfered with without ignoring decrees and the statutes relating to the distribution of water thereunder, which would bring about the conditions that existed prior to the time when we had any statutes on the subject relating to the adjudication of rights to· the use of water or its distribution by officials in accordance with such adjudication. The laws of the state providing for officials to distribute the waters of our streams for agricultural uses according to adjudicated priorities were passed for the purpose of securing an orderly distribution of such waters, and to prevent breaches of the peace which would inevitably ensue if the owners of priorities were permitted to divert and divide the waters of our streams according to their ideas of their adjudicated rights and needs. These laws must be strictly enforced and observed, and the courts have no power to annul them."

In Black's Pomeroy on Water Rights, a work published prior to the decisions of this court and those in Colorado above cited, it is said by the learned author, with reference to the duties of water commissioners under our laws, and· those of other western states where the use of water is under public control: "It is not thought that any valid objection could be maintained, on constitutional grounds, to the powers with which these commissioners are invested." (Sec. 215.)

The question arose in Colorado whether an interference with a headgate when the water commissioner was attempting to regulate the distribution of water pursuant to a general decree adjudicating priorities, amounted to a contempt of court, under a statute declaring it to be a contempt

to disobey any lawful writ, order, rule or process issued by a court, or judge at chambers. The supreme court held that it was not a contempt, for the reason that the commissioner was not an officer of the court, but, in the opinion, it was said: "This view is strengthened by the fact that the legislature has declared that any person who shall willfully interfere with any headgate or water box without authority shall be guilty of a misdemeanor and on conviction shall be fined and imprisoned, and that water commissioners shall, in the discharge of their duties, be invested with the powers of constables, and may arrest any person violating their orders relating to the opening or shutting down of headgates, or using of water for irrigation purposes. * * * This court has repeatedly upheld the irrigation law of this state, as being an exercise of the police power of the state. (Citing cases.) Under the above statute, and the decisions of this court, it may be well said that the water commissioner is a police officer of the state in the discharge of his official duties, invested with the powers of a constable, with authority to arrest persons interfering with him in the discharge of his official duties, which would seem to provide an ample remedy and adequate punishment for those guilty of such interference, without resorting to proceedings as for a contempt of court." (Roberson v. People, 40 Colo. 119, 90 Pac. 79.) This very strongly indicates the view entertained by that court concerning the penal provisions of the statute mentioned and the respect due the commissioner's authority, though the reference thereto may be regarded as in a sense mere dictum.

The question was raised in the supreme court of the United States whether a district court of Arizona, in a decree determining the rights of appropriators to the waters of a certain stream had authority to appoint a commissioner to distribute the water among the different canals according to the adjudicated priorities, and to impose upon a party a liability to pay a pro rata share of the salary of the commissioner as fixed by the decree. The decree expressly authorized the commissioner at all times when necessary

in the discharge of his duties to enter upon any and all
the canals and ditches, the dams, gates, flumes, and other
structures and appliances, and supervise and direct the
placing of, changing, closing or opening of the same, and
direct the placing of proper gates, dams or other means
for the control of the water of the stream at the heads
of the canals or other points on the banks of said canals
as he may direct, and to make rules and regulations as
he may deem proper for the distribution and use of the
water. In disposing of the objection to that part of the
decree, it said in the opinion of the court delivered by Mr.
Justice White, now Chief Justice, that the decree seemed
to be modeled upon legislative remedies provided for similar
situations in other jurisdictions, as the decree and the rem-
edies which it affords bear a peculiar resemblance to
legislative provisions enacted in some of the states where
irrigation is practiced, to control and regulate the use of
water for irrigating purposes; and the case of Farm In-
vestment Co. v. Carpenter, *supra*, is referred to as stating
the undoubted reason for such statutory provisions, fol-
lowing which it is further said: "But because it was within
the legislative power to provide administrative machinery
to supervise the common use of water in a flowing stream
by those having a lawful right to appropriate the water
that stream for beneficial use, it does not result that the
decree entered by the court below was in excess of its
authority. On the contrary, in view of the absence of leg-
islative action on the subject and of the necessity which
manifestly existed for supervising the use of the stream
by those having the right to take the water in accordance
with the decree, which, undoubtedly to that extent, the
court was authorized to render, we think the action of the
court did not transcend the bounds of judicial authority,
and therefore is not justly amenable to the attack made upon
it." (Montezuma Canal Co. v. Smithville Canal Co., 218
U. S. 371.) The reason finally assigned for sustaining the
authority of the court, *viz:* "the necessity which manifestly
existed for supervising the use of the stream by those

having the right to take water in accordance with the de-
cree," would also sustain the validity of legislation making
provisions similar to those of the decree in the case cited;
and the remarks of the court may rightly be regarded, we
think, as strongly indicating the view which the court would
take of such legislation, for the court no more than the
legislature could authorize the taking of private property
without just compensation.

While there may not be a close resemblance between the
right of one to appropriate the water of natural streams
for beneficial uses, and the right of a landowner to bore
wells for the purpose of bringing to the surface natural
gas and oil lying underneath the same, there seems to be
a sufficient analogy between the laws regulating such rights
to make proper here an allusion to the decisions upholding
the validity of legislation for the protection of all landown-
ers in an oil or gas field having an equal right to acquire
possession of those substances, as against the contention
that the enforcement of such legislation constitutes a taking
of private property without adequate or just compensation,
and a denial of due process of law. But our reference to
such decisions will be confined to a brief statement of the
conclusion reached by the courts, taking as an illustrative
case one decided by the supreme court of the United States,
affirming the supreme court of Indiana. Citing several
cases, the court observes in the opinion that the Indiana
cases are in accord with the rule of general law, and settle
the rule of property as follows: "Although in virtue of
his proprietorship the owner of the surface may bore wells
for the purpose of extracting natural gas and oil, until
these substances are actually reduced by him to possession,
he has no title whatever to them as owner. * * * that, in
the absence of regulation by law, every owner of the sur-
face within a gas field may prosecute his efforts and may
reduce to possession all or every part, if possible, of the
deposits without violating the rights of other surface own-
ers." The court then proceeds: "But there is a co-equal

right in them all to take from a common source of supply,
the two substances which in the nature of things are united,
though separate. It follows from the essence of their right
and from the situation of things, as to which it can be
exerted, that the use by one of his power to seek to con-
vert a part of the common fund to actual possession may
result in an undue proportion being attributed to one of
the possessors of the right, to the detriment of others, or
by waste by one or more, to the annihilation of the rights
of the remainder. Hence it is that the legislative power,
from the peculiar nature of the right and the objects upon
which it may be exerted, can be manifested for the purpose
of protecting all the collective owners, by securing a just
distribution to arise from the enjoyment by them, of their
privilege to reduce to possession, and to reach the like end
by preventing waste. * * * Viewed, then, as a statute to
protect or prevent the waste of the common property of
the surface owners, the law of the state of Indiana which
is here attacked because it is asserted that it devested private
property without compensation, in substance, is a statute
protecting private property and preventing it from being
taken by one of the common owners without regard to
the enjoyment of the others. * * * In view of the fact that
regulations of natural deposits of oil and gas and the
right of the owner to take them as an incident of title in
fee to the surface of the earth, as said by the supreme
court of Indiana, is ultimately but a regulation of real prop-
erty, they must hence be treated as relating to the
preservation and protection of rights of an essentially local
character. Considering this fact and the peculiar situation
of the substances, as well as the character of the rights of
the surface owners, we cannot say that the statute amounts
to a taking of private property, when it is but a regulation
by the state of Indiana of a subject which especially comes
within its lawful authority." (Ohio Oil Co. v. Indiana,
177 U. S. 190.)

In an early Montana case, (Thorp v. Woolman, 1 Mont.

168) a statute of that state for the appointment of commissioners to apportion appropriated waters "as they may in their judgment think best for the interest of all parties concerned, and with a due regard to the legal rights of all," was held void as conferring judicial power upon the commissioners, since they were thereby required, without the necessity of any previous legal determination of the various rights, to determine what was just and equitable between the interested parties. The case cannot be regarded as an authority denying the constitutionality of statutes like those under consideration. By later legislation in Montana, provisions are made for the appointment by the court of water commissioners in cases where the various priorities have been adjudicated, and making interference with them in the performance of their duties a contempt of court. The validity of such legislation does not appear to have been questioned. (See State *ex rel.* Flynn v. District Court, 33 Mont. 117, 82 Pac. 450; State v. District Court, 34 Mont. 267, 86 Pac. 798.)

The fact that a water official when engaged in the discharge of his duties pursuant to the statutory provisions, makes or may make an erroneous or wrongful distribution of water in individual cases, or erroneously opens a headgate to the passage of water for the use of an appropriator whose right to so use the headgate or ditch is denied by another, is no reason for holding the statute to be unconstitutional. The important duties imposed upon such officials could not be effectually performed, except with authority over headgates and other diverting works, and the power to regulate them. By such supervision no rights of private property are invaded, but, under the police power of the state, in the interest of the public welfare, and for the protection of private as well as public rights, property intended to be used for no other purpose than that of diverting public waters is regulated; and it is a mistaken notion that through such regulation private property is taken for either public or private use, within the meaning

of the constitutional provision prohibiting such taking without just compensation. All property is held subject to such restraints and regulations as the state may constitutionally make in the exercise of its police power. (32 Cyc. 677; See also Freund on Police Power, Secs. 511-517.)

It is contended that the notice required to be attached to a headgate whenever the commissioner takes control and regulates the same is insufficient to constitute due process of law, for the reason that the owner is given no opportunity to be heard. As well might it be said that a sheriff or constable before executing a writ, and as a condition to its lawful execution, must first notify the party against whom or whose property it is directed and afford him a hearing as to the manner of its execution or whether it should be executed at all. The notice provided for is for the obvious purpose of aiding in protecting the commissioner against unlawful interference in the discharge of his duties, by informing the interested parties as well as others that the headgate is under official control. It is certainly an untenable proposition that the duty of regulating the distribution of water according to adjudicated priorities cannot be lawfully or constitutionally performed without first providing a hearing with notice to all interested appropriators or ditch owners to determine the necessity or propriety of the proposed regulation. The statute itself, so far as appears to be necessary, prescribes when and how the duty shall be performed.

The trial court correctly ruled and instructed that the question of ownership of the ditch and headgate was immaterial, and that it was not within the province of the jury to consider it. In the event that anyone is aggrieved or deems himself aggrieved by the act of the water commissioner or other water official, the law affords him ample civil remedies through which his right as against other parties may be determined. It is held in Idaho that a water master cannot be required, in making a distribution of water, to look beyond the decree to ascertain whether or not the

same is supported by the findings; and that in a civil action to compel him to distribute the water in a different manner than that called for by the decree, no judgment can be entered, unless the other parties to be affected thereby are parties. (Stethem v. Skinner, 82 Pac. 451.) And so in Colorado, where it was sought to enjoin the state engineer, division superintendent and water commissioner from preventing the plaintiffs receiving into their canals the water which they claimed to be entitled to, the court said: "It is doubtless true that water officials must distribute the waters of a district or division according to adjudicated priorities, but when they are avowedly attempting to do so, * * * their action cannot be interfered with either by interlocutory order or final judgment, unless the real parties in interest are parties to the action." (McLean v. Farmers' Highline &c. Co., 98 Pac. 16.) If such a question may not be determined in a civil suit for relief against alleged wrongful or mistaken exercise of the power of the water official, unless the other parties whose rights would be affected are parties to the action, and we believe that to be the proper and correct rule, then clearly it is immaterial in a criminal case like the one at bar, where it is not possible for the other interested parties to appear and be heard. And it would be strange indeed, when a court is powerless to intervene in such a case as the one cited from Colorado, that the individual may himself determine that the commissioner has acted erroneously, and enforce that determination by his own acts, especially in the face of a statute making such acts a penal offense.

Holding that the statutes here assailed are not unconstitutional upon either of the grounds urged against them, it follows that the assistant water commissioner was authorized to control and regulate in accordance with adjudicated priorities the headgate in question, as well as others. As suggested above, if the defendant had any proper ground to complain of the manner in which or the purpose for which it was so regulated, he might have applied for relief

in the courts through some appropriate proceeding, but he was not justified in attempting to enforce what he may have regarded as his legal rights by taking the law into his own hands, thus violating a penal statute. As said in Crawford v. Ferguson, (Okla.) 115 Pac. 278: "A violation of law, when committed even for the purpose of enforcing the law, is not only illegal, but it is anarchy itself." (See also Cooley on Torts, 55; State v. Yeaton, 53 Me. 125; Commonwealth-v. McCue, 16 Gray, 226; State v. Hyde, 29 Conn. 564; Kirby v. Foster, (R. I.) 14 L. R. A. 317; People v. Smith, 131 Mich. 70.) Possibly a case might arise where an apparent violation of the statute might be justified as an act of necessity to prevent a present injury to property, that being its only purpose, and not involving a defiance of the commissioner's authority. But no such case is here presented.

It is, however, contended that the board of control is without judicial power to adjudge that any appropriator has such an interest in an irrigating ditch, as will authorize him to use it for diverting his appropriated water, though it may have been found that the appropriation was made by means of such ditch; or, in other words, that the adjudication of the board as to priorities of rights of appropriation does not determine ditch rights. But that point, however well taken, would not justify the defendant's acts. It is evident that a decree adjudicating water rights and priorities as well as a certificate of appropriation, must, for the purpose of adequate description and regulation, define the point or means of diversion, and that the same must be regarded as *prima facie* evidence of the right to take the water as decreed. It may be conceded that the determination of the board is not conclusive upon the question of the ownership of the ditch through which an appropriation is claimed or found to have been effected, or the right of the appropriator to use the same. But it is clear that, as incidental to the power to adjudicate priorities, the board must necessarily consider and determine, as a partial basis

for its decision upon the question of water rights and priorities, whether or not one claiming an appropriation is the owner of or has a sufficient interest in a ditch or other irrigating or diverting works by which the water so claimed may be diverted and conveyed to the place of its application to a beneficial use. The matter of ownership or interest in the ditch or other works is evidentiary, and considered for the purpose stated, and, however persuasive the finding of the board may be as to that matter, it does not follow that it would conclude a subsequent determination by the court in a proper case of the relative rights of the parties claiming the ditch or an interest therein, although the decree of the board as to water rights and the several priorities thereof may be final and conclusive; where there has been no appeal. But the right in the case at bar of the defendant to assert and prove title in himself to the ditch or the absence of an interest in Roberson, is quite another question. An attempt has been made by statutory provision to avoid this very difficulty, where there are conflicting claims to ditches and reservoirs. Unless the owners make a record specially provided by law, or have a record made in some other manner, showing the relative ownership of each interested party, it is declared that such interests shall be established by the ratio between the water right of each water user to the total water rights adjudicated under such irrigation works; and that "the relative interests of joint owners shall, therefore, be fixed by the issuance of the final certificate of appropriation as the same appears of record on February 20, 1907, or as they shall hereafter be recorded in the office of the board of control and in the office of the respective county clerks." (Laws 1907, Ch. 86, Sec. 22; Comp. Stat. 1910, Sec. 807.) In succeeding sections provisions are made for the filing of an affidavit by all the joint owners; and when so filed that the facts therein stated shall be *prima facie* evidence of the truth thereof; and that where the ownership is disputed, and the several owners cannot agree upon the amount of inter-

est owned by each, or one or more claimants desire the filing of the affidavit mentioned, while the others do not desire to join therein, one or more such claimants may bring an action in equity in the district court, in which the court shall determine the right of the several claimants to the ditch or ditch right, and all the facts necessary to be stated in the affidavit provided for, and that the decree in such action shall, after being recorded in the proper office, have the same force and effect as the affidavit referred to. These provisions, it is expressly declared, shall not be construed to relate to water rights, or in any way to conflict with the laws governing the same. (Laws 1907, Ch. 86, Secs. 23-27; Comp. Stat. 1910, Secs. 808-812.) The provisions of Section 807 clearly recognize the custom and propriety of describing in certificates of appropriation the ditch or ditches through which the appropriation has been granted, and in effect, at least where there are joint owners of a ditch, seem to make the certificate of appropriation *prima facie* evidence of the right of the appropriator to use the ditch. At any rate, where the statutory record as provided for in the sections above referred to has not been made, and in the absence of any other lawful determination as to ditch rights, or lawful restraining order, we see no reason to doubt the authority of the water commissioner to act upon the certificates of appropriation, and distribute the water accordingly.

The trial court correctly instructed the jury upon the law of the case, and the verdict is not only sustained by ample evidence, but a different verdict would not have been justified thereby. No error in any other respect having been suggested, the judgment will be affirmed.

*Affirmed.*

BEARD, C. J., and SCOTT, J., concur.