Edith M. THAYER, a/k/a Edith Thayer, Individually and as Executrix of the Estate of Sid Thayer, Bruce L. Thayer, Joan L. Thayer, Herbert F. Luthy, Richard D. Howieson and Pearl Irene Howieson, Appellants (Some of defendants below),

v.

CITY OF RAWLINS, a Wyoming Municipal Corporation, Appellee (Plaintiff below).

No. 4991.

Supreme Court of Wyoming.

May 4, 1979.

John A. MacPherson, and Catherine L. Dirck, Legal Intern, MacPherson, Golden & Brown, Rawlins, for appellants.

Steve D. Noecker, of Johnson & Noecker, Rawlins, and Frank J. Trelease, Stoughhouse, Cal., for appellee.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

ROSE, Justice.

This appeal concerns the rights of the defendant water users to effluent water discharged by the City of Rawlins. By virtue of water rights dating from 1900, the City of Rawlins has imported all of its municipal water supplies from the North Platte River and from Sage Creek, a tributary of the North Platte River. After using the water for municipal purposes, the City has historically discharged the resulting effluent into a channel, known as Sugar Creek, which connects with the North Platte River. In the past, the point of this discharge was above the points at which the defendants diverted the effluent for irrigation, stock water and other purposes. Defendants diverted the effluent pursuant to certificates of appropriations giving them priorities to the Sugar Creek effluent dating from 1914. To be in compliance with state and federal water-quality laws, the City must now meet certain minimum-quality standards before discharging water into Sugar Creek. To meet these standards, the City of Rawlins proposes to establish an aerated lagoon system at a location which will cause the purified water to reach Sugar Creek at a point below the defendants' point of diversion. In an effort to determine the legal effect of this proposal, the City sought and was granted a judgment declaring that the defendants were not entitled to compensation for the loss of this water. We will affirm the district court's judgment.

Certain aspects of this case justify a full and detailed explanation of the facts. According to an Agreed Statement of Facts, the City acquired water rights, in 1923, to water originating at the headwaters of Sage Creek, a tributary of the North Platte River. Thereafter, water wells—previously providing the City with water—were abandoned, and the City became totally dependent on the Sage Creek-North Platte water.

This water, which is piped some 32 miles to the City, was supplemented by additional water rights obtained in 1966. The remainder of the water supplied to the City is by virtue of a water right obtained by assignment from the Union Pacific Water Company in 1964. This water is transported some 16 miles from the North Platte River to the City through another pipeline.

It is agreed that Sugar Creek consists of a channel which heads some 16 miles west of Rawlins. The channel parallels the south side of the Union Pacific Railroad from a point west of the City to a point about 4 miles east of Rawlins, where it bends north across the railroad and meanders northeasterly, eventually emptying into the Platte River. Originally, the channel of Sugar Creek was used as an open sewer for parts of Rawlins. Subsequently, sanitary sewer mains were installed and the sewage was carried to a point east of Rawlins where it was again disgorged into the Sugar Creek channel. Since the City began disgorging its waste waters into Sugar Creek, the defendants perfected certificates of appropriations, claiming the right to use water out of Sugar Creek at points below where the City disgorges its sewage.

Evidence adduced at trial indicates that whatever flow of water occurred in Sugar Creek below the City was attributable to the City's discharge of sewage. From April to October of each year, this discharge would amount to a daily average of 2.76 cubic-feet-per-second of water. Above the City, a flow occurred in Sugar Creek only after a rainstorm or during snow-melt. The City's expert classified Sugar Creek above the City as an ephemeral stream, or one that runs only in direct response to rainfall and high snow-melt events and not as a result of ground-water flow. In the 1930's, a diversion dam was constructed—apparently without approval of State authorities—which directs this flow into an area known as Hogback Lake. At trial, the City stipulated that it would not object to

actions taken to prevent this flow from entering Hogback Lake or to the restoration of the natural channel of Sugar Creek for this purpose.

It is noted that the State of Wyoming was originally a named party to this suit. At trial, the City and the State of Wyoming stipulated that the State would withdraw from the action conditioned on the City's agreement that it would continue to discharge intermittently into Sugar Creek a majority of the sewage effluent it historically discharged into Sugar Creek, and that such waters would be available to water users downstream from the City's point of discharge, as well as to satisfy effluent appropriations in the North Platte River. When asked by the court whether this withdrawal carried the connotation that the State Engineer didn't want to administratively be involved in this matter, the attorney for the State responded that the State had jurisdiction over the use of the natural waters of the State and that this would go to the City's use of the water in question.[1]

It is also noted that the City, in 1922, conveyed by deed all rights to water passing through the sewer pipe and reaching a 20-acre parcel of land, presently owned by Walter Olson and Olson Sisters Corporation, described in a State Engineer Certificate of Appropriation. The City admitted its obligation under this deed.

Subject to the above-mentioned stipulations, the district court found that Sugar Creek was not a natural stream and, therefore, the defendants' appropriations were invalid and did not entitle them to compensation by reason of the City's proposed actions. The court found that the City had the power to recapture all of its future sewage for the purpose of disposing of in it any manner it deemed appropriate. Finally, the court found that the State Engineer had no jurisdiction over the Rawlins facilities or the water in question, and that his

---

1. We note at this point that due to the unique circumstances of this case—namely, that the defendants' use is dependent solely on the water imported by the City—there is no reason to apply the indispensable-party analysis contained in *State v. Husky Oil Company of Delaware*, Wyo., 575 P.2d 262 (1978).

approval was not required for the planned changes.

Defendants state their position as follows:

"I. The State Engineer and State Board of Control have jurisdiction over the proposed Rawlins facilities and waters of Sugar Creek which must be invoked before judicial determination is proper.

"II. Defendants have vested property rights that are established in Wyoming water law and are entitled to compensation before those water rights are taken away."

## ENTITLEMENT TO COMPENSATION [2]

Defendants premise their claim to compensation on the belief that Sugar Creek below the City of Rawlins has, due to the passage of a long period of time, become a natural stream subject to appropriation, thus entitling the defendants to protections afforded to other holders of water rights in the state.

Defendants also assert that Sugar Creek *above* the City is a natural stream. Frankly, we fail to see the importance of classifying the portion of Sugar Creek that lies above Rawlins. The extent to which the defendants have a right or interest in this upper flow of water is not at issue in this case. To the extent that they have a right to such waters—a question we do not here decide—the City has agreed not to interfere with a restoration of the natural channel of this portion of Sugar Creek. The importance of classifying Sugar Creek above the City is further lessened when it is realized that the water, for which defendants seek compensation, is derived solely from discharges that have their source in the North Platte River and tributaries thereof. These waters are entirely distinct from those, if any, originating in the Sugar Creek drainage basin above the City of Rawlins.

While it is true that these defendants have acquired certificates of appropriations, indicating a right to waters contained in Sugar Creek, we find that the validity of these permits—for purposes of protection from the City's proposed actions, and compensation—turns on an analysis of the parties' relative rights to the use of these imported waters. If the City, insofar as these defendants are concerned, has the unrestricted right to change its use and the point of discharge of these imported waters, then it matters little that these defendants hold water permits or have relied on these waters in the past for irrigation and other purposes. The issue of whether Sugar Creek has become a natural stream loses its importance in this context. If the City has the unrestricted right referred to above, then—with the possible exception of its relationship to certain jurisdictional matters—the determination of whether Sugar Creek below the City is a natural stream would be a resolution of a nonissue.

More than fifty years ago, this court stated, in *Wyoming Hereford Ranch v. Hammond Packing Company*, 33 Wyo. 14, 236 P. 764, 772 (1925):

"... Even in this state, where the conservation of water for irrigation is so important, we would not care to hold that in disposing of sewage the city could not adopt some means that would completely consume it. It might, we think, be diverted to waste places, or to any chosen place where it would not become a nuisance, without any consideration of the demands of water users who might be benefited by its disposition in some other manner. ..."

While we may not rely on the *Wyoming Hereford Ranch* decision for a disposition of the present case—due to significant factual distinctions—it is somewhat prophetic with respect to the clash, between concepts of western water law and the directives of environmental-protection statutes, now before us. We will not, however, attempt to decide all of the potential questions that are bound to arise as the demands for cleaner

---

2. We will discuss the defendants' issues in reverse order, because our holding on the second issue is largely dispositive of the first issue.

environment begin to impinge on the availability of sufficient supplies of water. For example, we are not asked in this case to theorize with respect to the rights of water users on the North Platte River in the event that the City had gone ahead with its original plan to entirely consume, through treatment, the waters it imports from the North Platte and its tributaries. These questions and others related thereto are bound to arise, but it is important to understand that they are not now before the court. See, gen., Comment, "Water Law—Cessation of Return Flow as a Means of Complying With Pollution Control Laws," 12 Land & Water L.Rev. 431 (1977); and Muys, "Quality v. Quantity: The Federal Water Pollution Control Act's Quiet Resolution in Western Water Rights Administration," 23 Rocky Mt.Min.L.Inst. 1013 (1977). As a result, our discussion and disposition of this case will be narrowly drawn.

■ The fundamental question becomes: Do the defendants have a right to compensation for a loss occasioned by the City's change in the point of discharge of imported waters? It has been stated that generally junior appropriators have vested rights in a continuation of stream conditions existing at the time of their appropriations, thus entitling them to resist changes in points of diversion or use which materially affect their rights. See, *Farmers Highline Canal & Reservoir Co. v. City of Golden*, 129 Colo. 575, 272 P.2d 629 (1954); and § 41–3–104, W.S.1977. However, an importer of water—at least insofar as these defendants are concerned—has the right to reuse, successively use and make disposition of imported waters. See, *City and County of Denver Board of Water Commissioners v. Fulton Irrigating Ditch Company*, 179 Colo. 47, 506 P.2d 144 (1972). Even though, at the time of the *Fulton Irrigation Ditch* decision, there was a statute authorizing the conclusion reached, the Colorado Supreme Court opined that the rule would be the same without the statute, subject to contrary contractual obligations. 506 P.2d at 147.

■ The right of the City to use such imported waters finds its roots in the common law of property and the Puritan ethic: One who by his own effort adds to the supply of a stream, is entitled to the water even though a senior priority might be without water. A person should reap the benefit of his own efforts, and a priority relates only to the *natural* supply of the stream at the time of appropriation. Clark, "Background and Trends in Water Salvage Law," 15 Rocky Mt.Min.L.Inst. 421, 434–444 (1969).

■ These concepts are not new to Wyoming water law, since they have been applied to protect the right of a senior appropriator to recapture waste and seepage water. See, *Binning v. Miller*, 55 Wyo. 451, 102 P.2d 54 (1940); and *Bower v. Big Horn Canal Association*, 77 Wyo. 80, 307 P.2d 593 (1957). See gen., Clark, supra, at 459–460; *Burkart v. Meiberg*, 37 Colo. 187, 86 P. 98 (1906); *Green Valley Ditch Co. v. Schneider*, 50 Colo. 606, 115 P. 705 (1911); and *Tongue Creek Orchard Co. v. Town of Orchard City*, 131 Colo. 177, 280 P.2d 426 (1955). The lower landowner using such water merely takes his chances as to future supplies, no matter how long he uses such water. *Binning v. Miller*, supra, 102 P.2d at 60.

■ Defendants seem to want this court to declare that the City has abandoned its right to make a change in the point of discharge of these imported waters. We indicated in *Binning v. Miller*, supra, that if the senior appropriator had allowed the lower landowner to use waste water for 35 years, but then legitimately began to use it himself, the lower landowner would have no right to complain—"The water is always different from year to year." 102 P.2d at 62. See, also, *Stevens v. Oakdale Irrigation District*, 13 Cal.2d 343, 90 P.2d 58 (1939). This question, in its broad sense, was raised but not answered in the *Fulton Irrigation Ditch* case, supra. See, gen., Williams, "Optimizing Water Uses: The Return Flow Issue," 44 U.Colo.L.Rev. 301, 318–321 (1973). We hold that in the imported-water context—which gives the importer the unre-

stricted right to reuse, successively use and make disposition—the importer's right to do these things is not subject to abandonment insofar as these defendants are concerned. It must be remembered that any other holding would be inconsistent with the fact that the defendants depend entirely on the City's sufferance—it is always free to terminate the importation. Under such circumstances, we are reluctant to declare an abandonment. This is particularly true in light of the fact that the City, as early as 1922, recognized its right to convey its rights in the effluent by deed. We would suggest that such a transaction places the user in a much more solid position. See, Williams, supra, at 321; and *Wyoming Hereford Ranch v. Hammond Packing Co.,* supra.

## JURISDICTION

Defendants assert that the State Engineer and the State Board of Control have authority to resolve their conflict with the City under Article 8, Wyoming Constitution[3], and three sets of statutory provisions: (1) Section 41–3–104, W.S.1977,[4] dealing with changes of use or places of use; (2) section 41–3–305, W.S.1977,[5] deal-

3. Article 8, Wyoming Constitution, provides:
 "IRRIGATION AND WATER RIGHTS
 "Sec. 1. *Water is state property.*—The water of all natural streams, springs, lakes or other collections of still water, within the boundaries of the state, are hereby declared to be the property of the state.
 "Sec. 2. *Board of control.*—There shall be constituted a board of control, to be composed of the state engineer and superintendents of the water divisions; which shall, under such regulations as may be prescribed by law, have the supervision of the waters of the state and of their appropriation, distribution and diversion, and of the various officers connected therewith. Its decisions to be subject to review by the courts of the state.
 "Sec. 3. *Priority of appropriation.*—Priority of appropriation for beneficial uses shall give the better right. No appropriation shall be denied except where such denial is demanded by the public interests.
 "Sec. 4. *Water divisions.*—The legislature shall by law divide the state into four (4) water divisions, and provide for the appointment of the superintendents thereof.
 "Sec. 5. *State Engineer.*—There shall be a state engineer who shall be appointed by the governor of the state and confirmed by the senate; he shall hold his office for the term of six (6) years, or until his successor shall have been appointed and shall have qualified. He shall be president of the board of control, and shall have general supervision of the waters of the state and of the officers connected with its distribution. No person shall be appointed to this position who has not such theoretical knowledge and such practical experience and skill as shall fit him for the position."

4. Section 41–3–104, W.S.1977, provides:
 "(a) When an owner of a water right wishes to change a water right from its present use to another use, or from the place of use under the existing right to a new place of use, he shall file a petition requesting permission to make such a change. The petition shall set forth all pertinent facts about the existing use and the proposed change in use, or, where a change in place of use is requested, all pertinent information about the existing place of use and the proposed place of use. The board may require that an advertised public hearing or hearings be held at the petitioner's expense. The petitioner shall provide a transcript of the public hearing to the board. The change in use, or change in place of use, may be allowed, provided that the quantity of water transferred by the granting of the petition shall not exceed the amount of water historically diverted under the existing use, nor exceed the historic rate of diversion under the existing use, nor increase the historic amount consumptively used under the existing use, nor decrease the historic amount of return flow, nor in any manner injure other existing lawful appropriators. The board of control shall consider all facts it believes pertinent to the transfer which may include the following:
 "(i) The economic loss to the community and the state if the use from which the right is transferred is discontinued;
 "(ii) The extent to which such economic loss will be offset by the new use;
 "(iii) Whether other sources of water are available for the new use.
 "(b) In all cases where the matter of compensation is in dispute, the question of compensation shall be submitted to the proper district court for determination."

5. Section 41–3–305, W.S.1977, provides:
 "The holder or owner of an adjudicated water right to the direct use of the natural unstored flow of any surface stream of the state may store such direct flow so long as no other Wyoming appropriator or user is injured or affected thereby. Prior to the commencement of the storage of water under a direct flow water right, the appropriator shall submit a request for such storage in writing to the state engineer and shall obtain the approval of the state board of control. The state board of control may permit storage at any time so long as there is no inter-

ing with the storage of direct-flow water rights; and (3) section 41–3–615, W.S.1977,[6] dealing with the construction of diversion dams.

These propositions are, in part, based on the belief that Sugar Creek is a "natural stream" above and below the City of Rawlins. As noted previously, we view it as irrelevant that Sugar Creek above the City might be considered a "natural stream." To the extent that it is somehow important, the defendants are faced with an adverse factual finding which we are not inclined to overrule.

■ With regard to Sugar Creek below the City, the defendants may well be correct that it is a natural stream. See, *Binning v. Miller*, supra, 102 P.2d at 60. Assuming, arguendo, that this is true, does this automatically give the State Engineer or the Board of Control jurisdiction over this controversy? We think not. As noted previously, the City—insofar as these defendants are concerned—has the unrestricted right to reuse, successively use, and make disposition of the imported waters in question. Unless there is some statutory provision to the contrary, there is nothing for the State Engineer or the Board to consider—there is only an application of certain legal principles which is within the function of the courts.

We turn, then, to the statutory provisions which purportedly vest the State Engineer or Board of Control with primary jurisdiction over the City's proposed actions. Defendants claim that the City's water-treatment proposal constitutes either a change or expansion in use—because the water will be used as a purifying agent, instead of only as a flushing agent—or a change in the place of use, because the sewage will be transported for treatment to a place outside the city limits. The City, on the other

hand, contends that there will be no change in use since the use will still be for municipal purposes, and that the place of use will remain with the City of Rawlins. The only change, according to the City, is a change in the place of discharge.

■ The difficulty in attempting to classify the changes required by water-pollution-control laws has been noted. Comment, supra, 12 Land & Water L.Rev. 431, 448. The Colorado Supreme Court has indicated that changes in points of discharge of sewage are not governed by the same rules as changes in points of diversion. *Metropolitan Denver Sewage Disposal District No. 1 v. Farmers Reservoir and Irrigation Company*, Colo., 499 P.2d 1190, 1193 (1972). See, *City of Boulder v. Boulder & Left Hand Ditch Co.*, Colo., 557 P.2d 1182, 1185–1186 (1976). This conclusion has, in turn, been severely criticized. Williams, supra, at 304–311. We find no need, however, to put a label on what the City of Rawlins proposes to do, in order to determine whether the City must file a petition under § 41–3–104, supra.

■ The purpose of § 41–3–104, supra, is to provide a procedure for those wishing to change a water right *and* to place limitations on the quantity of water that can be transferred. *Basin Electric Power Cooperative v. State Board of Control*, Wyo., 578 P.2d 557, 561 (1978). We must ask why the City's proposal should be subjected to these procedures. The manifest result of a § 41–3–104 proceeding is the entry of a Board of Control order limiting the amount of water transferred by a change in use or a change in the place of use. Insofar as these defendants are concerned, we have already held that the City has the *unrestricted* right to reuse, successively use and make disposition of these imported waters. If these rights are not subject to restriction, it

---

ference with existing water rights or uses. The state engineer is authorized and empowered to prescribe such rules and regulations as may be necessary or desirable to enable him to effectively administer the provisions of this section."

**6.** Section 41–3–615, W.S.1977, provides:

"Duplicate plans for any diversion dam across the channel of a running stream,

above five (5) feet in height, or of any other diversion dam intended to retain water above ten (10) feet in height, shall be submitted to the state engineer for his approval, and it shall be unlawful to construct such a diversion dam until the said plans have been approved."

would be anomalous to require the City to submit to a procedure that assumes that restrictions are permissible and, indeed, required. As a result, we hold that the State Engineer and Board of Control have no jurisdiction, by virtue of § 41–3–104, supra, over the controversy between these parties.

 Next, defendants would rely on § 41–3–305, supra. This statute requires Board of Control approval prior to the storage of water by a direct-flow appropriator. Defendants assert this will occur by virtue of the City's impoundment of the sewage in aerating lagoons for treatment. Simply stated, we find no indication of legislative intent that this provision should apply to the temporary holding of effluent waters for water-treatment purposes, especially when all of those waters are imported.

Finally, defendants rely on § 41–3–615, supra. This statute requires State Engineer approval prior to the construction of a diversion dam "to retain water above ten (10) feet in height." The uncontradicted evidence at trial was that, depending on how the holding ponds were constructed, water would be retained at an average height of five feet. Notwithstanding the fact that we fail to see how this provision relates to the question of compensation, the defendants have failed to prove its applicability.

We hold that the State Engineer and Board of Control have no jurisdiction of the controversy between these parties, nor do we see any reason in this case to draw upon the expertise of those agencies.

Affirmed for the reasons stated herein.

ROONEY, Justice, dissenting, with whom RAPER, Chief Justice, joins.

I dissent. I agree with the contention of the defendants that this matter is prematurely in the courts, and that the board of control should first apply its expertise in passing on the issues.

"Beneficial use" of water is paramount. Water is a precious commodity in this state. It has always been so, but with the advent of new uses, the changes in the relative importance of the varied uses, and the increased demands on its use, the necessity to achieve beneficial use of every drop is an overriding concern. As stated by Justice Raper in his dissent in *State By and Through Christopulos v. Husky Oil*, Wyo., 575 P.2d 262, 275 (1978):

"The concept of beneficial use may thus be characterized as the ultimate foundation and measure of every water right held under the priority appropriation system prevailing in this and other arid states. *Budd v. Bishop*, Wyo.1975, 543 P.2d 368, 373; *Lincoln Land Co. v. Davis*, U.S.D.C.Wyo.1939, 27 F.Supp. 1006, 1008; *McNaughton v. Eaton*, 1952, 121 Utah 394, 242 P.2d 570. * * * "

All issues involving water must be controlled by this concept of beneficial use. The concept is simple in principle, but it is complex in application. This complexity and the continuing and long time future ramifications resulting from implementing it mandate attention and direction by those who have experience and expertise in the area.

The necessary expertise and experience in water matters are with the board of control and the office of the state engineer.[1] They are conversant with the new problems occasioned by increased industrial and municipal needs for water; additional use of water for recreational purposes; transbasin diversions; interstate aspects of water availability and control; intrusion into underground acquifers; diversions of underground streams; development of chemical and physical methods for control of initial flow, for control of return flow and for control of storage of water; pollution; and waste. And they are conversant with the interplay of these new problems on customary and historical use of water.

The overriding importance of beneficial use of water and the primary authority of the board of control and of the state engineer over such use have recognition in our

---

1. Both the board of control and the office of the state engineer are constitutionally established. The state engineer is a member and president of the board of control. See §§ 2 and 5 of Art. 8, Wyoming Constitution.

constitution. Section 31 of Art. 1, Wyoming Constitution,[2] provides:

"Water being essential to industrial prosperity, of limited amount, and easy of diversion from its natural channels, its control must be in the state, which, in providing for its use, shall equally guard all the various interests involved."[3]

All of Art. 8, Wyoming Constitution, has to do with irrigation and water rights.[4] Section 3 of Art. 8, Wyoming Constitution, provides that "[p]riority of appropriation for beneficial uses shall give the better right." Portions of § 2 of Art. 8, Wyoming Constitution, are emphasized as follows:

"There shall be constituted a board of control, to be composed of the state engineer and superintendents of the water divisions; which shall, under such regulations as may be prescribed by law, have the supervision of the waters of the state and of their *appropriation, distribution and diversion*, and of the various officers connected therewith. Its decisions to be *subject to review by the courts* of the state." (Emphasis supplied).

The emphasized portions of the foregoing reflect two things: The supervision of the board of control in appropriation, distribution and diversion of water is primary, and the decisions resulting from such supervision are subject to *review* by the courts.

Considering these two things in reverse order, this court has held that this section of the constitution directs that "[t]he jurisdiction of the courts is (aside from appeals) confined to determine the rights of the parties in individual cases to the extent that the board has not acted." *Campbell v. Wyoming Development Co.*, 55 Wyo. 347, 100 P.2d 124, 134, reh. den. 102 P.2d 745 (1940). We said in *White v. Wheatland Irrigation District*, Wyo., 413 P.2d 252, 258–259 (1966):

"* * * The board has broad powers, direct and implied. [Citations.] It has long been recognized that orders of the board establishing such rights are clothed with the dignity of decrees entered by the courts. [Citation.]

\* \* \* \* \* \*

"* * * the board is no doubt better equipped than a court to determine such intricate and involved matters. [Citation.]

"* * * adjudicated water rights of long standing * * * will not be set aside unless the proof of just cause is 'clear, cogent and convincing,' [Citation.]"

See *Farm Investment Co. v. Carpenter*, 9 Wyo. 110, 61 P. 258 (1900); *Kearney Lake, Land & Reservoir Company v. Lake DeSmet Reservoir Company*, Wyo., 475 P.2d 548 (1970), supplemented 487 P.2d 324 (1971); *Hamp v. State*, 19 Wyo. 377, 118 P. 653 (1911). In *Laramie Irrigation & Power Co. v. Grant*, 44 Wyo. 392, 13 P.2d 235, 240 (1932) the court said:

"* * * The term 'stream' has not been defined by the Legislature. Nor is there any provision that, in order for the board of control to proceed to determine or adjudicate water rights, it must proceed to determine those of a whole watershed or of a whole stream at the same time. Taking all these facts into consideration, we think that the board was given a discretion in deciding the meaning of the term 'stream.' "

This is not to say that the courts are without jurisdiction in water matters. *Anita Ditch Company v. Turner*, Wyo., 389 P.2d 1018 (1964); *Simmons v. Ramsbottom*, 51 Wyo. 419, 68 P.2d 153 (1937); *Farm Investment Co. v. Carpenter*, supra. However, except in those instances where the unusual or emergency nature of the matter dictates otherwise, a party should be compelled to obtain final available administrative action

---

2. Art. 1, Wyoming Constitution, pertains to the "Declaration of Rights."

3. This section places all "water" under control of the state. Section 2 of Art. 8, Wyoming Constitution, gives supervision of "the waters of the state" to the board of control. Section 5 of Art. 8, Wyoming Constitution, gives "general supervision of the waters of the state" to the state engineer. Section 1 of Art. 8, Wyoming Constitution, makes some of the waters the "property of the state," i. e., the "water of all natural streams, springs, lakes or other collections of still water."

4. Art. 8 is set out in full in footnote 3 of the majority opinion.

before seeking judicial action. *State ex rel. Mitchell Irr. Dist. v. Parshall*, 22 Wyo. 318, 140 P. 830 (1914). The purpose of such was set forth in *United States v. Zweifel*, 10th Cir., 508 F.2d 1150, 1156 (1975), cert. den. sub nom. *Roberts v. United States*, 423 U.S. 829, 96 S.Ct. 47, 46 L.Ed.2d 46, reh. den. 423 U.S. 1008, 96 S.Ct. 438, 46 L.Ed.2d 379:

" * * * 'When there is a basis for judicial action, independent of agency proceedings, courts may route the threshold decision as to certain issues to the agency charged with primary responsibility for governmental supervision or control of the particular industry or activity involved.' [Citations.] The principal reason behind the practice of so routing certain issues to agency tribunals is the need for orderly and sensible coordination of the work of agencies and of the courts. 'Whether the agency happens to be expert or not, a court should not act upon subject matter that is peculiarly within the agency's specialized field without taking into account what the agency has to offer, for otherwise parties who are subject to the agency's continuous regulation may become the victims of uncoordinated and conflicting requirements.' 3 Davis, Administrative Law Treatise § 19.01 (1958)."

In the past, the water and the water rights here involved were subject to board action in determination of beneficial use. Appropriations were granted on Sugar Creek. The board has, therefore, determined it to be a stream. The city's appropriation was obtained from the board. It cannot be said that the board has not acted on the core of the problem—beneficial use. It should be permitted to augment that action and apply its expertise to the issues here presented. In the words of Justice Raper in *State By and Through Christopulos v. Husky Oil*, supra:

" * * * This court has encouraged use of the board of control and mentioned, '[t]he ludicrous spectacle of learned judges solemnly decreeing water rights.' *Louth v. Kaser*, Wyo.1961, 364 P.2d 96." 575 P.2d at 282.

The majority opinion has here invalidated certificates of appropriation issued by the board of control—and this is done in a proceeding which is collateral to the proceeding in which the appropriations were granted. The majority opinion has here countermanded the determination by the board of control that Sugar Creek is a stream—again in a collateral proceeding to that determination. These determinations by the board should have been subject to reexamination and reanalysis by the board, whereby its expertise could be applied to gauge the effect of new developments on them and to insure maximum beneficial use of the waters involved. The result could well be the same as that reached by the majority opinion. But the application of the expertise of the board may have identified serious shortcomings in this result. Whatever result reached, it would be subject to court *review*. The court could approve or disapprove, but the court would have the benefit of the expertise of the board. It may not agree with the application of the expertise, but the decision of the courts would be made in the manner circumscribed by statute, court rules and precedent in the normal legal context. Review would be in conformity with principles established for appeal and error.

The other item emphasized in the foregoing quotation from § 2, Art. 8 concerns that which is placed under the supervision of the board of control, i. e, "the waters of the state and of their appropriation, distribution and diversion." This supervision is extensive. It is not limited to appropriation of water—although historically appropriation and that immediately incident thereto was the first task for the board and was a major interest of the board. The constitutional provision directs five areas for such supervision: (1) generally of the waters of the state; (2) appropriation of such; (3) distribution of such; (4) diversion of such; and (5) of the various officers connected therewith.[5] This direction is not one which may be waived by the board or by the state

---

**5.** This last area mandates the legislature to centralize control of all water matters in the board, rather than in some other independent agency or officer.

engineer. Nor can they avoid the constitutionally imposed obligations by delay in favor of court disposition before taking action. The duties are not permissive. They are mandatory.

Supervision of "distribution and diversion" includes supervision of water which is not appropriated, and it includes supervision of appropriated water at times and places other than those involved at the initial distribution or diversion. It includes supervision of individual appropriations, of transbasin appropriations, of trans-state deliveries, of underground water—in short, of all water. *Sussex Land & Live Stock Co. v. Midwest Refining Co.*, 8th Cir. 1923, 294 F. 597, 603, on appeal from U.S.D.C., Wyoming, has been said to stand for the proposition that, pursuant to §§ 1 and 3 of Art. 8 of the Wyoming Constitution, a priority of right in water includes the quality as well as the quantity. Quality is a proper concern of the board of control. In the Wyoming Environmental Quality Act, § 35–11–101 et seq., W.S.1977 the legislature was careful to preserve the preeminence of the jurisdiction of the state engineer and the board of control in water matters by providing:

"Nothing in this act:

\* \* \* \* \* \*

"(c) Limits or interferes with the jurisdiction, duties or authority of the state engineer, the state board of control, \* \* \*." Sec. 35–11–1104, W.S.1977.

The majority opinion overlooks this primary jurisdiction and the extensive control of quantity and quality of water in the board of control for the purpose of securing beneficial use of it. The majority opinion lays its cornerstone on the proposition that an importer of water has the unobstructed right to reuse, *successively use and make disposition of imported waters.* The importer, then, would have supervision over the appropriation, distribution and diversion of such water. Imported water is no less

precious than any other kind of water. The mere fact that it is transported from one basin to another does not make it more subject to waste, more subject to the whims of any private citizen, less subject to the requirement of beneficial use, or less subject to the constitutional supervision of the board of control. If there is case law to the contrary, I would reverse it. If there is statutory law to the contrary, I would hold such to be unconstitutional.

Since the supervision by the board of control is subject to court review, it cannot be arbitrary or characterized by an abuse of discretion. It is also subject to regulations prescribed by law. Section 2, Art. 8, Wyoming Constitution.

Constitutional aspects of the issues here presented make proper the conclusions reached in this dissent. But the application of legislative enactments relative to permit requirements, beneficial use, relative rights of appropriators, changing and enlarging use, preferred uses, storage and reservoir requirements, and change in points of diversion and in place of use would result in the same. In support thereof, it is sufficient for the purpose here to refer to the dissents of Justices Raper and Guthrie in *State By and Through Christopulos v. Husky Oil*, supra,[6] wherein the situation is fully analyzed and properly reasoned.

Neither these constitutional aspects nor these statutory aspects are addressed to conclusion in the majority opinion. It stops short of considering the issues of change in use or change in place of use. And it does not direct referral of such issues to the board of control. It backs into its holding. It does not concern itself with the rights of *all* users to the water in question. The loss of use of water by appellants is to it immaterial. It does not address the question of whether or not the city had *relinquished control of the water* discharged over the years into Sugar Creek. If it were a relinquishment, rather than reuse or recapture

---

6. This dissenting opinion is not only in conformity with the dissents in *State By and Through Christopulos v. Husky Oil*, supra, it is not contrary to the majority opinion therein.

The majority opinion did not address the substantive issues involved, but remanded the case for joinder of the Board of Control and the City of Cheyenne as necessary parties.

before losing control, there would be no question but that Sugar Creek is a stream and that appellants' appropriations were independent of the city's use. See *Lasson v. Seely*, 120 Utah 679, 238 P.2d 418 (1951) where the court held that a deposit of sewage back into a stream channel after having been used to full extent intended by the city becomes part of state water and again subject to appropriation on the basis of priority.

The majority opinion was predicated entirely on the proposition that an importer of water has the unrestricted right to change its use and point of discharge without reference to beneficial use. Its reliance on *Bower v. Big Horn Canal Association*, 77 Wyo. 80, 307 P.2d 593 (1957) and on *Binning v. Miller*, 55 Wyo. 451, 102 P.2d 54 (1940) to sustain this proposition is without recognition of the fact that the seepage water recaptured by the appropriators in those cases was water escaping inadvertently from them and was not water which was intentionally abandoned and to which control was relinquished, as in this case. Likewise, reliance on *City and County of Denver Board of Water Commissioners v. Fulton Irrigating Ditch Company*, 179 Colo. 47, 506 P.2d 144 (1972) is misplaced. The Colorado constitutional and statutory provisions relative to procedural water law are so different from those of Wyoming that they cannot logically be used as precedent. Further, the many problems resulting in Colorado from the transbasin diversion involved in that case are to be avoided in Wyoming, if possible.

Once the relinquishment by the city of the control of the discharge into Sugar Creek is recognized, it follows that Sugar Creek is a natural stream and that appellants' appropriations are valid and vested. The city project would then be subject to the statutes relative to change of use and change in place of use. The board of control would make the determination relative thereto on the basis of beneficial use.

The parties to this action spent considerable effort addressing the issue of whether or not Sugar Creek is a natural stream. The desirability and necessity of bringing available expertise to this issue is obvious.

As already indicated, the board has recognized it to be such in the past, issuing certificates of appropriation from it. It appears as a stream on maps of the U.S. Geological Survey. Also as already indicated, the board has been given discretion in deciding the meaning of the word "stream." *Laramie Irrigation & Power Company v. Grant*, supra. In making its determination, the board may apply that set out in one case decided by this court as the elements of a natural stream, i. e., consisting of a channel, well-defined bed and banks, and a current of water. *State v. Hiber*, 48 Wyo. 172, 44 P.2d 1005 (1935), but it should note the court cautioned at p. 1009 that:

" * * * Too much stress ought not, perhaps, be placed upon any one of the elements mentioned, and all should be given due consideration. * * * "

The board could note that the court recognized a "water course" created by man to be a natural stream in *Binning v. Miller*, supra. A composite dictionary definition of the words "natural" and "stream" could be "water, on or under the surface, pertaining to, produced by or conferred by nature (in contrast to that which is artificial) which has a flow or a current." The board might find that Sugar Creek is no longer a natural stream—or, perhaps, never was such. The definition used in the majority opinion of an ephemeral stream, i. e., one that runs only in direct response to rainfall and high snow-melt, is not very helpful. It would apply to the Mississippi River. An ephemeral stream (one running for a very short time) could be a natural stream. In our arid country, there are many of them. The point is that the board of control should exercise its expertise in making this determination. It would then be subject to court review.

There are other aspects of this matter which should be subject to the board's expertise and determination before court review.

The board may pass on the extent to which principles and procedures applicable to water used for irrigation should be also applied, or should not be applied, to water used for municipal purposes under the cir-

cumstances here present. For example, return flow from irrigation is not the same as that resulting from municipal use. Return flow from irrigation is usually subsurface and passes through many channels, generally very small in size. The return flow from a municipality is generally a collection of discard from sanitary and storm sewers discharged in comparatively large volume in one or few channels. The considerations under which the two types of return flow are treated will probably differ substantially.

Beneficial use of appropriations for irrigation can be controlled by setting a limit in relation to the amount of land to be irrigated. This limit is statutorily set at one cubic foot per second for seventy acres. Section 41-4-317, W.S.1977.[7] The use and reuse of the one cubic foot per second on the seventy acres before allowing return flow is proper if it is beneficially used. Even the limit cannot be taken if all of it is not beneficially used. *Quinn v. John Whitaker Ranch Co.*, 54 Wyo. 367, 92 P.2d 568 (1939); *Budd v. Bishop*, Wyo., 543 P.2d 368 (1975); *Farm Investment Co. v. Carpenter*, supra. The appropriation, limitation, and beneficial use is controlled by observation and by measurement at the points of diversion and elsewhere. Here again appropriations for municipal use have different aspects. A municipal appropriation can exceed that for which the water can be put to beneficial use at the time of appropriation. *Holt v. City of Cheyenne*, 22 Wyo. 212, 137 P. 876 (1914). Domestic uses vary from day to day. They continue throughout the year, not only during an irrigation season. They do have seasonal variations. Some municipalities grow in size, some diminish. Municipalities have constitutional authority to acquire water rights of prior appropriators by eminent domain—paying just compensation therefor.[8]

These things are mentioned only to emphasize the necessity and desirability of having the board first consider such matters. Thus, uniformity and coordination in all water uses can better be obtained in addition to the application of expertise and experience to the problems.

Finally, the board and the state engineer should be addressing the varied water problems occasioned by recent changes in population and industry in the state. They cannot do so if they are bypassed by premature court action. One appropriator of an irrigation right cannot transfer it to another appropriator for an industrial right without full analysis by the board and the state engineer of the result on beneficial use. The same is true of a transfer by a municipality to an industrial use.

This case had its origin in a very worthy direction to the City of Rawlins to clean up its discarded water. To do so will cost money. It would be incongruous, in view of the value of water in Wyoming, to not also direct the city to preserve the water as it cleans it—preserve it for additional beneficial use. This may cost more money. Cleaning water is no more worthy than preserving it. The board of control should determine the relation of beneficial use to other aspects of the project. The board may authorize the project as now planned. It may direct pumping to the original place of discharge. It may direct a different method of cleaning. It may require payment of just compensation to the damaged appropriators.[9] It may require change in reservoir construction to provide for a deeper but less extensive body of water so as to reduce evaporation. It may reach the same conclusion as did the district court.

In any event, the board of control should be afforded the opportunity to pass upon the beneficial use of the water involved in the project. The courts would have ample opportunity to *review* the decision, if necessary.

I would reverse and remand with directions that the plaintiff be ordered to

---

7. The limit is raised in surplus water situations. See §§ 41-4-317 through 41-4-324, W.S.1977.

8. Section 5, Art. 13, Wyoming Constitution. Although the appropriator obtains the right to use water and not the ownership of water, the

right obtained is a property right. *Johnston v. Little Horse Creek Irrigating Co.*, 13 Wyo. 208, 79 P. 22 (1904).

9. If just compensation is to be made, the board should refer the matter to the district court for determination of the award.

submit the plans for the project to the state engineer for review and approval.