# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 126

### APRIL TERM, A.D. 2015

### September 16, 2015

IN RE:  THE GENERAL ADJUDICATION OF
ALL RIGHTS TO USE WATER IN THE BIG
HORN RIVER SYSTEM AND ALL OTHER
SOURCES, STATE OF WYOMING,

BETTY WHITT,

Appellant
(Objector),

v.

HAT BAR CATTLE COMPANY,

Appellee
(Petitioner),

and

THE STATE OF WYOMING,

Appellee
(Respondent).

S-14-0257

*Appeal from the District Court of Washakie County*
*The Honorable Robert E. Skar, Judge*

*Representing Appellant:*
     *Sky D. Phifer, Phifer Law Office, Lander, Wyoming.*

*Representing Hat Bar Cattle Company:*
     *William L. Miller, Miller & Fasse, P.C., Riverton, Wyoming.*

*Representing the State of Wyoming:*

> Peter K. Michael, Attorney General; Jay Jerde, Deputy Attorney General; Christopher Brown, Senior Assistant Attorney General; Brian Annes, Student Intern. Argument by Mr. Annes.

**Before BURKE, C.J., and HILL, KITE\*, DAVIS, and FOX, JJ.**

***\* Justice Kite retired from judicial office effective August 3, 2015, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2015), she was reassigned to act on this matter on August 4, 2015.***

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BURKE, Chief Justice.**

[¶1]    In this third and final phase of the general adjudication of water rights in the Big Horn River, the Special Master recommended adjudicating the right to irrigate 52 acres of land owned by Hat Bar Cattle Company.[1]  That recommendation was made following a hearing on an objection to the adjudication from neighboring landowner Betty Whitt. The district court adopted the Special Master's Report and Recommendation, and adjudicated the Hat Bar's water rights.  Ms. Whitt appeals the district court's decision. We will affirm.

## *ISSUES*

[¶2]    Ms. Whitt presents three issues, which we have reworded for clarification:

> 1.    Did the Special Master err in shifting the burden of proof from the claimant, Hat Bar, to the objector, Ms. Whitt?
>
> 2.    Was the finding by the Special Master that the water at issue had been put to beneficial use prior to December 31, 1963, clearly erroneous?
>
> 3.    Was the finding by the Special Master that the 52 acres of Hat Bar lands had been continuously irrigated from December 31, 1963, to the date of the hearing clearly erroneous?

## *FACTS*

[¶3]    This appeal arises from the general adjudication of water rights in the Big Horn River system.  The adjudication began on January 24, 1977, and was divided into three phases.  Phase I dealt with Indian reserved water rights, Phase II with non-Indian reserved water rights, and Phase III with state water rights evidenced by a permit or certificate. *In re General Adjudication of All Rights to Use Water in the Big Horn River System*, 803 P.2d 61, 65 (Wyo. 1990) (*Big Horn II*).  This appeal is part of Phase III.

---

[1] Hat Bar owns additional property and has previously adjudicated water rights not at issue in this litigation.  We also note that, of the 52 acres at issue here, Hat Bar owns only 49 acres.  Scott and Nanette Chryst own the remaining 3 acres located at the northeast corner of the Hat Bar property.  The Chrysts did not appear at the hearing before the Special Master, and have not participated in this appeal.  Because the issues and questions regarding the Chrysts' water rights are the same as those for Hat Bar, we will simplify our discussion by referring to the Hat Bar and the Chrysts collectively as Hat Bar.

[¶4]    The Hat Bar Cattle Company, owned by Jerry Winchester and his wife, was the successor to State Permit No. 1366E, Enlarged Aragon Ditch, a permit originally filed by the United States Bureau of Indian Affairs on May 5, 1905. The Bureau routinely applied for and received extensions of time to accomplish beneficial use under the permit, but the permit eventually expired on December 31, 1963. However, it was never cancelled. Under the procedures adopted by the district court for this adjudication:

> Permits not in good standing will be reinstated prior to adjudication. Delinquent notices will be filed, together with affidavits or other competent evidence, showing beneficial use prior to expiration of the permit deadline to the current date. The field inspection to confirm the requirements for reinstatement may be combined with that for adjudication to save time.

*In re: The General Adjudication of All Rights to Use Water in the Big Horn River System*, Docket No. 86-0012, Fifth Judicial District Court, *1997 Amended Big Horn Adjudication Phase III – Procedures*, Chapter IV, Section A.3 ("*Phase III Procedures*").

[¶5]    The field inspection was conducted in the spring of 1994 by Bobby Lane, a water rights specialist for the State Engineer's Office. He was accompanied by Mr. Winchester, Mike Redman representing the Tribal Water Engineer's Office, and Tony Shakespeare from the Bureau of Indian Affairs. Based on their inspection of the property, along with other information discussed below, the four reached a consensus that, of the 207 acres covered by the permit, 52 acres showed evidence of irrigation, and 155 did not. Accordingly, Mr. Lane's report recommended reinstating the permit for the 52 irrigated acres "with adjudication to follow." The remaining 155 acres were eliminated from the permit, with Mr. Winchester's consent.

[¶6]    According to the expired permit, water was conveyed to Hat Bar property out of the Wind River through the Enlarged Aragon Ditch, then through a ditch that runs through Ms. Whitt's property to the Hat Bar. Ms. Whitt objected to the State's recommendation to adjudicate water rights for the 52 acres. The Special Master conducted a contested case hearing, and much of the evidence received will be discussed in detail below. The Special Master upheld the State's Report, and submitted a report to the district court recommending adjudication of the 52 acres at issue.

[¶7]    In the district court, Ms. Whitt filed an objection to the Special Master's Report and Recommendation, asserting that the evidence from the hearing did not support the Special Master's findings. The district court noted that, under W.R.C.P. 53(e)(2), the Special Master's report had to be adopted unless it was clearly erroneous. Determining that Ms. Whitt had not shown the report to be clearly erroneous, the district court adopted

the Special Master's decision and adjudicated Hat Bar's water rights. On September 5, 2014, the district court entered its Final Order concluding the general adjudication of the Big Horn River system. Ms. Whitt filed this timely appeal.

## DISCUSSION

[¶8]    Ms. Whitt first contends that the Special Master improperly shifted the burden of proof from Hat Bar to her. Allocation of the burden of proof is a matter of law. Our review is therefore *de novo*. *JB v. State*, 2013 WY 85, ¶ 5, 305 P.3d 1137, 1139 (Wyo. 2013).

[¶9]    A brief discussion of the procedures used in this general adjudication is helpful as background. With regard to permits not in good standing, like Hat Bar's, the procedures adopted by the district court provided for the State to prepare a report on reinstating those permits, including proof by affidavits or other evidence that the lands covered by the permit had been irrigated. Proof of irrigation was to be confirmed by a field inspection performed by the State. *Phase III – Procedures*, Chapter IV, Sections A.3 and B.5(a). The State's reports were submitted to the district court for review by the Special Master, and notice of the reports was published in local newspapers and mailed to interested parties. *Id.*, Chapter IV, Sections A.5 and A.6. If a report was not contested, the Special Master and district court generally approved it. *See Regulations and Instructions of the State Board of Control,* Chapter IV, Section 1.i.[2] However,

> In the event an advertised proof is contested . . . the procedures outlined in Section 4 of this chapter shall be followed:
>
> (1)    A claimant may not rest upon the allegations contained in affidavits as sufficient evidence to support the adjudication of a water right.
>
> (2)    The claimant must produce credible evidence in the form of testimony, subject to cross examination which supports the statements made on the proof form.

*Id.*, Chapter IV, Section 1.j.   As Ms. Whitt correctly asserts, these procedures and

---

[2] Although the State Board of Control's regulations do not apply directly to the adjudication by the court, the *Phase III Procedures* state that the "procedures generally used by the Board of Control for adjudication . . . will be utilized with modifications as provided." *Phase III – Procedures*, Chapter IV, Section A.1.

regulations establish that the burden of proof was on Hat Bar to provide evidence supporting the adjudication of its water right.

[¶10]  Ms. Whitt points out that the Special Master's report in this matter included this conclusion of law:

> 6.      The Special Master's Order dated January 25, 2007 provides that the State of Wyoming will have the initial burden of establishing the foundation for and the authenticity of the [State's] Report concerning this permit.  The objecting parties shall then have the burden of challenging the State's Report.  The State has met its burden, and the objector's challenge to the State's Report did not provide evidence refuting the determination of historic irrigation.

She claims that the Special Master erred in placing the burden of proof on her.

[¶11]  We agree that this conclusion of law is not entirely accurate.  It overlooks the claimant's burden to "produce credible evidence in the form of testimony, subject to cross examination which supports the statements made on the proof form."  Despite the misstatement, however, review of the Special Master's Report and Recommendation demonstrates that the Special Master did not actually err in placing the burden of proof.

[¶12]  In the Report and Recommendation's fourth conclusion of law, the Special Master quoted the applicable regulation regarding the burden of proof:

> In the event an advertised proof is contested . . . the procedures outlined in Section 4 of this chapter should be followed:
>
> (1)      A claimant may not rest upon the allegations contained in affidavits as sufficient evidence to support the adjudication of a water right.
>
> (2)      The claimant must produce credible evidence in the form of testimony, subject to cross examination which supports the statements made on the Proof form.

This demonstrates that the Special Master was aware that the burden of proof fell on Hat Bar.  The State and Hat Bar were first to present witnesses and exhibits, followed by Ms. Whitt.  We have previously recognized that the party with the burden of proof generally presents its case first.  *See JB*, ¶ 10, 305 P.3d at 1140.  The Report and Recommendation carefully catalogues and discusses the testimony and other evidence

presented by the State and Hat Bar, further indicating that the Special Master correctly required them to present evidence supporting their case.

[¶13]  The Special Master required the State and Hat Bar to produce their evidence first. After the State had established the foundation for and authenticity of its report recommending the adjudication of water rights, Hat Bar presented its witnesses and exhibits concerning irrigation on the property.  The Special Master then allowed Ms. Whitt an opportunity to present her evidence.  After all of the evidence was received, the Special Master considered it, and found the State and Hat Bar's evidence more persuasive than Ms. Whitt's.  Despite the Special Master's misstated conclusion of law, we find no error in the way the burden of proof was allocated in this hearing.

[¶14]  In her second and third issues, Ms. Whitt challenges the Special Master's findings that the water at issue had been put to beneficial use prior to December 31, 1963, and continuously thereafter.  She claims that the findings are clearly erroneous.  A reviewing court "will not disturb a specific factual finding unless it is clearly erroneous or against the great weight of the evidence." *In re General Adjudication of All Rights to Use Water in the Big Horn River System*, 2002 WY 89, ¶ 9, 48 P.3d 1040, 1045  (Wyo. 2002) (*Big Horn VI*).

> The definitive test of when a finding is clearly erroneous was adopted by the United States Supreme Court in *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).  "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Id*. at 395, 68 S.Ct. at 542.

*Hopper v. All Pet Animal Clinic*, 861 P.2d 531, 538 (Wyo. 1993).  "When addressing a sufficiency-of-the-evidence question, this court looks at only the evidence most favorable to the prevailing party, giving it every favorable inference and leaving out of consideration entirely evidence in conflict therewith."  *Big Horn VI*, ¶ 51, 48 P.3d at 1057.

[¶15]  As a preliminary matter, we review the regulations applicable to these issues.  As noted earlier, the *Phase III Procedures* generally adopted the procedures of the State Board of Control in adjudicating water rights.  These procedures provide that permits not in good standing could be reinstated and adjudicated upon proof that "the lands have been continuously irrigated from the proper source . . . since the date of expiration of notice of beneficial use." *Regulations and Instructions of the State Board of Control,* Chapter IV, Section 1.h.  As explained by Nancy McCann, the Big Horn adjudication officer for the Wyoming State Engineer's Office, expired permits could be reinstated and adjudicated by

a showing that the property "was irrigated prior to the expiration date," and "was continuously irrigated" to the present. The Hat Bar water permit had expired on December 31, 1963. Accordingly, the Special Master had to determine whether the water had been beneficially used prior to that date, and continuously since then.

[¶16] The record supports the finding that water had been put to beneficial use on the Hat Bar property prior to December 31, 1963. One witness, Will Guthrie, purchased the property in 1959 and sold it in 1963. He did not irrigate the property during his ownership, but he recalled that there were ditches crossing the property that could have been used for irrigation. The presence of these ditches in 1959 leads to a reasonable inference that the property had been irrigated at some time prior to December 31, 1963. Slim Whitt, Ms. Whitt's ex-husband, testified that he had observed cleared farmland when riding across the Hat Bar property in the 1960's. He observed that farming on that property would not have been possible without irrigation.

[¶17] Boyhood memories of Mr. Winchester also indicate the property had been irrigated prior to 1963. He testified that his father's company acquired the property from Mr. Guthrie in the early 1960's, and recalled his father irrigating the property. He also recalled that in the early 1960's, a meadow of alfalfa was growing on the Hat Bar property near the Chrysts' house. He testified that "if you plant alfalfa, it has to be irrigated in this part of the country, or it doesn't grow."

[¶18] Mr. Lane, who prepared the State Report on the Hat Bar water rights, testified that he generally relied on aerial photographs from 1939 and 1954 to support his reports. He usually used these as input for his recommendations to adjudicate or eliminate the water rights. He could not recall specifically if these aerial photographs were used in preparing his report for the Hat Bar water, but as he explained, he prepared that report in 1994, and "[i]t's been a long time ago."

[¶19] Based upon the foregoing, we conclude that there is adequate evidentiary support for the Special Master's finding that the Hat Bar property had been irrigated prior to December 31, 1963. There is also evidence that supports the finding that water had been put to beneficial use on the Hat Bar property continuously since December 31, 1963. Before reviewing that evidence, however, we find it necessary to consider the regulatory term "continuously irrigated." One dictionary definition of the word continuous is "marked by uninterrupted extension in space, time, or sequence." *Webster's Ninth New Collegiate Dictionary* 284 (1991). That definition seems inappropriate in the context of irrigation water rights. We have previously recognized that irrigation in Wyoming is seasonal. *Thayer v. Rawlins*, 594 P.2d 951, 963 (Wyo. 1979). Using irrigation water only during the summer is not "uninterrupted" use. Indeed, under our statutes, an abandonment of a water right occurs if the water is not used "during any five (5) successive years." Wyo. Stat. Ann. § 41-3-401(a) (LexisNexis 2015). Thus, a water right may remain valid even if the water is not used for four successive years. Ms. Whitt

6

suggests that this statute provides guidance as to the meaning of "continuously irrigated," and that the party with the burden of proving continuous irrigation "should provide affirmative proof that the property to be adjudicated was irrigated at least once every five years." We see no reason not to accept Ms. Whitt's definition for purposes of this case.

[¶20] Following his inspection and investigation in 1994, Mr. Lane concluded that the 52 acres had been regularly irrigated. When asked how he determined that there had been irrigation, he explained: "It's – it's pretty evident to tell dry land from irrigated or wetland or subirrigated land. The land showed irrigation history, I mean, history of growing grass." Most significantly, Mr. Lane's conclusion actually represented a consensus among him, Mr. Winchester, a representative of the Bureau of Indian Affairs, and a representative of the Tribal Water Engineer's Office. As Mr. Lane explained

> There was always discussion with all of us. Everybody had to agree. I mean, if there was a disagreement, we didn't get the accomplishment done as far as the field inspection of the land. We had to agree on the acreage amounts, and we had – and the Tribes and the BIA had input on all of the inspections that we did.

In Hat Bar's case, they agreed that the evidence of irrigation indicated that the permit should be reinstated and adjudicated for 52 acres, while 155 acres not showing evidence of historical irrigation should be eliminated.

[¶21] Loren Smith, the superintendent of Water Division 3, testified that he received a request from Hat Bar for a temporary change in the point of diversion in 2004, and again in 2005. Hat Bar wanted to pump water directly from the river rather than convey it across Ms. Whitt's property. Mr. Smith reviewed aerial photos from 1994 and 2001 and saw evidence that the property had been irrigated. When he visited the property in 2004, he saw a channel coming through the fence between the Hat Bar and Ms. Whitt's property, a small pond, and other evidence of irrigation over the years. He visited the property again in 2007, and saw "[a]bout the same thing I saw in 2004." In addition, Mr. Winchester testified to irrigation practices over the years when his father's company owned the Hat Bar, and later when his company owned the property.

[¶22] In her testimony, Ms. Whitt denied that there was any ditch crossing from her property to the Hat Bar, and stated that, other than "wastewater," no irrigation water had ever flowed through a ditch across her property to the Hat Bar during the twenty years she had owned her property. However, Mr. Winchester, Mr. Lane, and Mr. Smith all testified to the presence of this ditch. Moreover, as Mr. Smith explained regarding the Hat Bar's use of "wastewater" flowing off of Ms. Whitt's property, "[t]hat's typical irrigation in Wyoming, to collect the wastewater and reuse it on other lands under that same appropriation." The reuse of "wastewater" under the same appropriation is still

considered beneficial use of the water. Thus, Ms. Whitt's testimony that "wastewater" may cross from her property onto the Hat Bar provides additional evidence of irrigation by Hat Bar.

[¶23] Ms. Whitt points out that the evidence of continuous irrigation does not cover every year since 1963. We agree that there is no direct evidence of irrigation for the period from Mr. Lane's preparation of the report in 1994 to the 2001 aerial photograph. However, given evidence of irrigation in 1994 and earlier, and again in 2001, 2004, 2005, and 2007, it was not unreasonable for the Special Master to find it more probable than not that irrigation had also occurred in the interim. The evidence as a whole and the reasonable inferences taken from it provide sufficient support for the Special Master's finding that the Hat Bar was "continuously irrigated" over the years. We are not definitely and firmly convinced that a mistake has been committed, and so find no basis for reversal.

[¶24] We conclude that the Special Master applied the burden of proof correctly, and that the findings regarding beneficial use of the water before December 31, 1963, and continuously thereafter are not clearly erroneous. Accordingly, we affirm the district court's adoption of the Special Master's Report and Recommendation.